**WAUKESHA MOTOR COMPANY,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 61–C–51.

United States District Court,
E. D. Wisconsin.

Jan. 22, 1971.

Richard R. Teschner and James Urdan, Milwaukee, Wis., for plaintiff.

Johnnie M. Walters, Asst. Atty. Gen., Donald R. Anderson, Arthur L. Biggins, and Angelo Castelli, Attys., Dept. of Justice, Washington, D. C., and Robert J. Lerner, U. S. Atty., Milwaukee, Wis., for defendant.

REYNOLDS, District Judge.

## JURISDICTION

This is a civil action brought under Title 28 U.S.C. § 1346 for refund of United States corporation excess profits taxes alleged to have been overpaid by plaintiff for the fiscal year ending July 31, 1953, and for refund of United States corporation income taxes alleged to have been overpaid by plaintiff for the fiscal years ending July 31, 1953 through July 31, 1958, together with interest as allowed by law. The action arises under the provisions of the Internal Revenue Codes of 1939 and 1954. Jurisdiction is present.

The statutes and regulations involved are as follows:

Internal Revenue Code of 1954, 26 U.S. C. (1964 ed.):

"§ 471. General rule for inventories.

"Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

Treasury Regulations on Income Tax (1954 Code), 26 C.F.R.:

"§ 1.471–1 Need for inventories.

"In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * *"

"§ 1.471–2 Valuation of inventories.

"(a) Section 471 provides two tests to which each inventory must conform:

"(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

"(2) It must clearly reflect the income.

"(b) It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with §§ 1.471–1 through 1.471–9. An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income.

"(c) The basis of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. \* \*

\* \* \* \* \* \*

"(e) Inventories should be recorded in a legible manner, properly computed and summarized, and should be preserved as a part of the accounting records of the taxpayer. The inventories of taxpayers on whatever basis taken will be subject to investigation by the district director, and the taxpayer must satisfy the district director of the correctness of the prices adopted.

"(f) The following methods, among others, are sometimes used in taking or valuing inventories, but are not in accord with the regulations in this part:

"(1) Deducting from the inventory a reserve for price changes, or an estimated depreciation in the value thereof.

"(2) Taking work in process, or other parts of the inventory, at a nominal price or at less than its proper value.

"(3) Omitting portions of the stock on hand.

"(4) Using a constant price or nominal value for so-called normal quantity of materials or goods in stock.

"(5) Including stock in transit, shipped either to or from the taxpayer, the title to which is not vested in the taxpayer."

"§ 1.471–3 Inventories at cost.

"Cost means:

"(a) In the case of merchandise on hand at the beginning of the taxable year, the inventory price of such goods.

"(b) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts, except strictly cash discounts approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. To this net invoice price should be added transportation or other necessary charges incurred in acquiring possession of the goods.

"(c) In the case of merchandise produced by the taxpayer since the beginning of the taxable year, (1) the cost of raw materials and supplies entering into or consumed in connection with the product, (2) expenditures for direct labor, (3) indirect expenses incident to and necessary for the production of the particular article, including in such indirect expenses a reasonable proportion of management expenses, but not including any cost of selling or return on capital, whether by way of interest or profit.

\* \* \* \* \* \* "

[The provisions of § 22(c) of the Internal Revenue Code of 1939 and § 39.22 (c) of Treasury Regulations 118 (1939 Code) are identical to § 471 of the 1954 Code and the regulations set out above.]

## BACKGROUND AND FINDINGS

The issue in this case involves the proper method of inventory valuation and involves approximately $400,000 plus interest. The facts are substantially undisputed. Many of them were stipulated to, and others were set forth in exhibits introduced at trial or by testimony that was uncontradicted. Even though these facts are substantially undisputed, they are complicated, and the parties are in sharp dispute as to the relevance of some, the significance of others, and the final inferences to be drawn from most of them.

Plaintiff is a Wisconsin corporation with its principal place of business in Waukesha, Wisconsin. It manufactures a wide variety of engines for different uses in various industries.

Plaintiff employs the accrual method of accounting and accordingly uses inventories to determine its annual income.

Plaintiff alleges that substantial amounts of its indirect factory expenses

represent losses sustained on account of excess productive capacity. Each year since 1948, plaintiff has been claiming these alleged losses as income tax deductions on its corporate income tax returns as part of the total sum set forth as cost of goods sold. The Commissioner of Internal Revenue (1) disallowed a proportionate part of this claimed deduction for cost of goods sold, and (2) required that the proportionate part disallowed be included as part of the cost of plaintiff's ending inventories.

More specifically, plaintiff filed its excess profits tax (1953) and federal income tax (1953–1958) returns, and after audit of these returns, the Commissioner of Internal Revenue assessed additional taxes against plaintiff for each of these years on the basis of six different adjustments. Plaintiff paid the additional taxes assessed and filed timely claims for refund with the District Director. After the Commissioner disallowed these claims, plaintiff filed this action.

The question at trial was whether all of these "unabsorbed" factory expenses could be deducted each year as an idle or excess capacity expense, as plaintiff contends, or whether a proportionate part of these costs should be included with plaintiff's ending inventories, as the defendant contends. The answer to this question depends on the propriety of the method used by the plaintiff in accounting for its inventories.

During the six years in issue here (1953–1958), plaintiff claimed as income tax deductions approximately eleven million dollars of unabsorbed burden. Plaintiff contends that substantially all of this unabsorbed burden represents "idle or excess capacity expense." The Government denies this contention.

Plaintiff's argument in support of this contention is primarily theoretical and threefold: (1) the practical capacity method of allocating factory burden automatically separates idle or excess capacity expenses from other production expenses by an account called unabsorbed burden, (2) plaintiff uses the practical capacity method, and (3) plaintiff's unabsorbed burden therefore necessarily represents idle or excess capacity expense.

For reasons set forth in this opinion, I believe that this syllogism is false because of the invalidity of the second premise. The plaintiff did not use the practical capacity method properly here and erred in the procedure used in computing its burden rates and in its failure to adjust its erroneous burden rates to reflect significant changes in wages and prices that occurred during the period of time that these rates were being applied

In addition, even if the practical capacity method has all of the merits claimed by the plaintiff, and assuming arguendo that this method, when properly applied, can be used to value inventories for federal income tax purposes, plaintiff still could not prevail here because (1) plaintiff's unique problems of shifting production volumes and shifting product mixes between different operating departments having different fixed costs make the use of the practical capacity method clearly inappropriate for purposes of inventory valuation, and (2) the adjustments made by the Internal Revenue agents were necessary and proper, and no other adjustment would have been appropriate.

A more detailed analysis and an explanation of some of the things gleaned at this trial follows.

As stated above, plaintiff uses the accrual accounting method. Its valuation of its inventories is based on three components: direct labor, direct materials, and indirect manufacturing expenses or burden. The parties agreed on the treatment of direct labor and direct materials, but they disagree over the plaintiff's treatment of its manufacturing expenses or burden.

Plaintiff claimed as income tax deductions the following amounts of manufacturing expenses or burden that remained "unabsorbed" at the end of each year

as the result of the accounting method that it was using:

| Year | Amount |
|------|--------|
| 1953 | $ 1,593.906 |
| 1954 | 2,231,674 |
| 1955 | 1,568,916 |
| 1956 | 990,007 |
| 1957 | 2,113,078 |
| 1958 | 2,440,070 |
| Total | $10,937,651 |

Plaintiff claims that it uses the practical capacity method of accounting for production costs and that under that method the amounts of manufacturing expenses that are not absorbed during the year represent idle or excess capacity expenses. Plaintiff contends that its unabsorbed burden, because it does represent idle or excess capacity expenses, is fully deductible at the end of each year.

The Commissioner of Internal Revenue disallowed these claimed deductions and adjusted plaintiff's accounts for cost of goods sold (which costs are fully deductible each year) and ending inventory (which costs are not deductible until sold) to reflect proportionate parts of plaintiff's unabsorbed manufacturing expenses.

As indicated above, the question presented here is whether plaintiff's method of accounting for its manufacturing expenses should have been accepted by the Commissioner for federal income tax purposes, i. e. whether plaintiff used a proper method of accounting for its inventories. Determination of this ultimate question will depend on the answers given to three other questions:

1. What is the practical capacity method?

2. Did plaintiff properly use the practical capacity method?

3. Is the practical capacity method appropriate for inventory valuation in this case?

## THE PRACTICAL CAPACITY METHOD

To understand the theory and application of the practical capacity method, several accounting terms must first be understood:

1. *Practical capacity* is the maximum attainable (practical) productive capacity of a manufacturing operation. The denominator for practical capacity in this case is earned hours. Normal hours, standard hours, normal standard hours, budgeted hours, and capacity hours are all used interchangeably for practical capacity.

2. *Manufacturing expenses* are the many items of expense in operating a factory which cannot be directly measured and charged on a scientific basis against a product. These expenses exist because the plant is there and it is in production and they are presumably a part of the cost of production. Manufacturing burden or overhead are often used interchangeably with manufacturing expenses.

3. *Fixed expenses* are those that go on from period to period to period, whether the plant is open or not, whether the plant is busy or not. They are relatively constant despite the level of production. Changes in production volumes do not materially affect them.

4. *Variable expenses* are those that increase when production increases and decrease when production decreases.

5. *Normal burden rate*, under the practical capacity method, is computed on the basis of the spending level at attainable capacity divided by the attainable capacity of the plant. When the spending level at attainable capacity is based on the historic accounting costs of a department and that department had only been operating at about a sixty per cent capacity, the spending levels should be adjusted upwards to reflect what they would be at one hundred per cent capacity.

6. *Unabsorbed burden* is the difference between the normal burden rate applied to the actual earned standard hours and the actual overhead expense incurred. Plaintiff equates the term *idle plant* with unabsorbed burden.

The practical capacity method of accounting involves a basic concept of business economics which is: unit production costs are substantially affected by changes in production volume. While some costs do not fluctuate with changes in production volume, others do. Therefore, because some costs are fixed, there is an inverse relationship between production volume and unit production costs. As production volume increases, unit costs of production decrease. As production volume decreases, unit costs of production increase. The lowest unit cost of production, therefore, is achieved at the maximum attainable capacity of a manufacturing operation.

Some accounting theorists believe that the differences in production costs that are attributable to differences in production volume should not be accounted for in the same manner as other production costs. This difference, they contend, represents the cost of idle (excess or unused) plant capacity that should not be carried into inventory but rather charged each year against profits. The method of accounting used to reflect this theory is called the practical capacity method.

The practical capacity method of accounting involves two different stages at two different points in time: The first stage involves the determination of a burden rate at practical capacity. This is done *before* the accounting period begins and accordingly involves various estimates relating to costs and production volume for the coming year. It is first necessary to estimate the attainable productive capacity of the manufacturing operation involved and to state this capacity in equivalent units such as earned hours of direct labor, machine hours, etc. Secondly, it is necessary to estimate what the total amount of burden expense will be at the maximum attainable or practical productive capacity of a manufacturing operation. The normal or standard burden rate for the operation is then computed by dividing the first estimated figure—attainable productive capacity expressed in units of earned hours of direct labor or machine hours— into the second estimated figure—dollar burden budget at practical capacity.

This procedure may be summarized either by a formula or by a schedule. The formula for computing the normal burden rate may be expressed as follows:

$$\text{Normal burden rate} = \frac{\text{Practical capacity burden expenses}}{\text{Practical capacity earned hours}}$$

The schedule form, illustrated below, permits expression of the parallel computations involved in computing the component "Fixed" and "Variable" burden rates as well as the "Total" burden rate which represents their sum:

|   | | Fixed Component | Variable Component | Total |
|---|---|---|---|---|
| 1. | Expenses at Practical Capacity: | $150,000 | $50,000 | $200,000 |
| 2. | Earned Hours at Practical Capacity: | 25,000 | 25,000 | 25,000 |
| 3. | Normal (Standard) Burden Rate: | $6.00/hr. | $2.00/hr. | $8.00/hr. |

Having established the burden rate prior to the beginning of the accounting period, the second stage of the practical capacity method is not reached until *after* the accounting period is ended. At this point, the burden rate previously established is applied to the actual earned hours of the period. The product of these two factors (burden rate x actual earned hours) represents the amount of burden that was "absorbed." A computation is then made of the difference between burden expenses that were actually incurred during the period and burden expenses that were previously budgeted (or burden absorbed). This

difference is called "unabsorbed" burden. The computation of unabsorbed burden may be illustrated as follows:

| | | |
|---|---|---|
| 1. Actual burden expense: | | $175,000 |
| 2. Actual earned hours: | 12,500 | |
| 3. Normal burden rate: | $8.00/hr. | |
| 4. Burden absorbed (2. x 3.): | | 100,000 |
| 5. Unabsorbed burden (1. – 4.): | | $ 75,000 |

After the amount of unabsorbed burden has been computed, it is necessary to make a careful study of the composition of this unabsorbed burden. This study is called variance analysis. The purpose of variance analysis under the practical capacity method is to disclose and thus distinguish the amount of unabsorbed burden that is attributable to volume variance (or variance caused by the deviation of the actual activity level from the practical capacity level) and the amount attributable to budget variance (or variance caused by the deviation of actual overhead costs from budgeted amounts). No variance analysis was made by plaintiff in this case.

## THE ACCOUNTING PROCEDURES FOLLOWED BY PLAINTIFF

In order to discuss the accounting procedures actually used by the plaintiff, it is necessary to explain two terms used in the testimony and in the accounting exhibits: direct expenses and indirect (or allocated) expenses. Direct expenses are the same as variable expenses. Indirect expenses are not either fixed or variable expenses. Some are fixed; some are variable; and others are equivocal.

Indirect expense represents the costs of operating approximately sixty indirect support departments which are allocated to the direct producing departments on the basis of the twelve different allocation pools as follows:

"Fixed-Four" Expenses

1. Floor Space Area
2. Machine Cost
3. Tools, Jigs, and Fixture Cost
4. Factory Equipment Cost

"Other Indirect" Expenses

5. Propane and Oxygen
6. Gasoline and Oil
7. Horsepower Hours
8. Machine Hours
9. Standard Man Hours
10. Standard Man Hours in Assembly and Test
11. Standard Man Hours in Machine Shop
12. Material Burden

The four indirect expenses set forth in the lefthand column above were referred to at trial as the "fixed-four." Plaintiff viewed the fixed-four as primarily fixed expenses; so did its independent auditors. Whether the other indirect expenses are fixed or variable is disputed.

The plaintiff used several different series of burden rates during the several different years in issue here. For convenient reference, these burden rates may be summarized at the outset here as follows:

| Effective Date of Burden Rates | Period of Time Costs Based On |
|---|---|
| a. July 1, 1951 (1951 rates) | 44 weeks ending July 1, 1951 |
| b. May 1, 1953 (1953 rates) | 18 months ending January 31, 1953 |
| c. October 4, 1954 (1954 rates) | X |
| d. May 1, 1956 (1956 rates) | 15 months ending October 31, 1955 |

The procedures that plaintiff followed for computing its 1951 and 1953 rates were essentially the same. Both rates will accordingly be discussed together here.

■ The burden rate for direct expenses was computed by dividing actual expenses by actual hours. Since direct expenses may be equated with variable expenses, this procedure is correct under the practical capacity method. It is true that actual expenses are being divided by actual hours rather than capacity expenses being divided by capacity hours as the formula prescribes, but, on analysis, this is no deviation from the practical capacity method when *variable* expenses are involved. The hourly rate for variable expenses will be the same under both computations.

The burden rate for indirect (or allocated) expenses was computed by two

different procedures. The burden rate for the fixed-four was computed by dividing actual expenses by the higher of actual hours or standard (capacity) hours. The burden rate for the other indirect expenses was computed by dividing actual expenses by actual hours.

The procedure followed for computing the fixed-four burden rate was erroneous. Under the practical capacity method, the burden rate for fixed expenses must be computed by dividing capacity expenses by capacity hours and not actual expenses by the higher of actual or capacity hours as was done here. The nature and impact of this significant error—using the higher of actual or capacity (standard) hours—is illustrated in the following chart which was presented at trial:

|   |  | 1952 Budget | 1952 Actual | 1953 Actual |
|---|---|---|---|---|
| a. | Hours | | | |
| | (1) Regular | 100 | 100 | 100 |
| | (2) Overtime | | 80 | |
| | Total | 100 | 180 | 100 |
| b. | Fixed Expenses | $100 | $100 | $100 |
| c. | Variable Expenses | 100 | 180 | 100 |
| d. | Total | $200 | $280 | $200 |
| e. | Old Burden Rate | $2/hour | | |

The second column (1952 Actual) set forth in the above illustration was then used as the basis for computing the new burden rate as follows:

| | | |
|---|---|---|
| a. | Fixed Expenses | $100 |
| b. | Higher of Actual or Normal Hours | 180 |
| | Burden Rate for Fixed Expenses (a. ÷ b.): | $ .56 |
| c. | Variable Expenses | 180 |
| d. | Actual Hours | 180 |
| | Burden Rate for Variable Expenses (c. ÷ d.): | 1.00 |
| e. | New Burden Rate | $1.56 |

Finally, in this illustration, the new burden rate ($1.56) was applied to this same hypothetical Department A during the following year (1953 Actual) with the following accounting result:

| | | | |
|---|---|---|---|
| a. | Actual Expenses | | |
| | (1) Fixed | | $100 |
| | (2) Variable | | 100 |
| | Total | | $200 |
| b. | Actual Hours | 100 | |
| c. | New Burden Rate | $1.56 | |
| d. | Burden Absorbed (b. x c.): | | 156 |
| e. | Unabsorbed Burden or Idle Plant | | $ 44 |

The last step in this illustration shows that this hypothetical Department A incurred $44 of unabsorbed burden even though it was operating at its practical capacity. Plaintiff's expert witness testified that this $44 represented unused capacity and other expenses. I believe that such a characterization is nonsense. This department had no unused capacity. It had no other expenses. The amount of unabsorbed burden computed was simply the accounting result of applying an erroneous burden rate.

The same erroneous procedure and the same erroneous accounting result illustrated in the above example are also found in plaintiff's burden rates and plaintiff's unabsorbed burden account during the first four years (1953–1956) in issue here.

Plaintiff's 1953 burden rates were based on expenses incurred during twelve months of 1952 and the first six months of 1953. The dollar amounts of overtime incurred during this base period along with the reduced amount of overtime that was incurred thereafter may be summarized here as follows:

| Year | Overtime Allowance |
|---|---|
| 1952 | $359,470.75 |
| 1953 | 29,017.54 |
| 1954 | 13,495.82 |
| 1955 | 77,949.71 |
| 1956 | 144,677.22 |

In addition to this "tremendous amount of overtime" in 1952, there was also a second shift of thirty-five men.

In addition to this schedule showing the dollar amounts of overtime, another schedule was introduced which showed a comparison of budgeted hours with actual earned hours on a departmental basis for these same four years. This schedule may be reproduced in part for convenient reference and discussion here as follows:

### Waukesha Motor Company
### Comparision Of Budgeted Hours With Actual Earned Hours

| | | Burden Budget - 5/1/53 | | | Actual Earned Hours | | | |
|---|---|---|---|---|---|---|---|---|
| | | (1) Standard Man Hours | (2) Actual Hours | (3) Higher of (1) or (2) | 4/8 7/31/53 | 7/31/54 | 7/31/55 | 7/31/56 |
| 010 | Piston | 18900 | 17724 | 18900 | 10950 | 11071 | 11158 | 16065 |
| 011 | Drill Press | 79200 | 95307 | 95307 | 65774 | 48423 | 68193 | 93380 |
| 012 | Grinding + Milling | 60750 | 77878 | 77878 | 54430 | 43010 | 54047 | 77003 |
| 013 | Gears + Rockwell Arms | 67200 | 71691 | 71691 | 46138 | 36158 | 46430 | 69085 |
| 014 | Cementing Circle (large type) | 67200 | 59959 | 67200 | 34085 | 19560 | 29629 | 44687 |
| 015 | Engine Lathe - Chuck type | 109700 | 150607 | 150607 | 95560 | 43508 | 53068 | 77778 |
| 016 | Heat Treating | 7650 | 10435 | 10435 | 6545 | 5370 | 6829 | 9847 |

[A3623]

This partial reproduction shows seven direct departments. The burden rates for the fixed expenses (fixed-four) of these departments were computed by dividing actual expense dollars by the higher of actual or normal (standard) hours. The period of time on which this computation was based was eighteen months ending January 31, 1953. Five of these seven departments had exceeded normal (standard) hours during this eighteen-month period. During the first three years following the adoption of this new burden rate (1953–1955), however, none of these five departments even attained, much less exceeded, practical capacity. For this reason the fixed-four expenses of these departments were being substantially and erroneously underabsorbed during these three years. The extent of this error is even more dramatically shown in the following year (1956) when this same rate was still being applied to ten of the twelve months involved in that year. In 1956, plaintiff again incurred very substantial amounts of overtime. The amount of overtime incurred, however, was still substantially less than it had been in 1952. Four of these five departments, therefore, were again able to exceed their practical ca-

pacity but not to the high level of activity previously attained and on the basis of which their respective burden rates had been computed. For this reason all four of these departments incurred substantial amounts of "idle or excess capacity expense" even though they were operating substantially in *excess* of their attainable practical capacity. This obviously erroneous result is not the consequence of applying the practical capacity method. It is the consequence of plaintiff's erroneous procedures.

Plaintiff did not use the same procedure for computing the burden rates for its other indirect expenses as it did for the fixed-four. Instead of using the higher of actual or normal standard hours for these other indirect expenses, plaintiff divided actual expenses by actual hours. The propriety of this method will depend on whether or not these expenses are fixed or variable. Dividing actual expenses by actual hours is a proper alternative procedure for computing the burden rate for variable expenses but is not a proper alternative for fixed expenses. Since both plaintiff and its independent auditors treated these other indirect expens-

es as variable expenses, this procedure was proper here.

Analysis of plaintiff's 1954 burden rate revision is brief. No study was made by plaintiff to support this revision. A nameless person simply "increased the rate during that period [by] twenty cents per hour"—significantly, not 20 percent but twenty cents across the board. This arbitrary procedure resulted in disparate increases between departments which may be illustrated as follows:

| Department | 5/1/53 Rate | 10/4/54 Rate | Percent of Increase |
|---|---|---|---|
| 010 Piston | $4.20 | $4.40 | 5% |
| 011 Drill Press | 3.00 | 3.20 | 7% |
| 033 MZR–FC–130 Series Crankcase | 6.30 | 6.50 | 3% |
| 039 180–195 Series Assembly | 2.10 | 2.30 | 10% |

Plaintiff's principal expert witness ventured to speculate that one reason for this revision in 1954 was because "accelerated depreciation * * * came into effect about that time." If this were a reason, the arbitrary nature of the revision itself clearly defeated this purpose. As this witness previously pointed out, plaintiff's machine shops have high fixed costs and high burden rates while plaintiff's assembly departments have low fixed costs and low burden rates. The machine shop rates should accordingly have been increased more than the assembly departments. Yet the impact of this rate revision was just the opposite. For this reason the 1954 rates not only perpetuated the errors already inherent in the existing rate structure on which they were based but also introduced further interdepartmental distortions of its own.

The procedure plaintiff followed for computing its burden rates for 1956 may be summarized and evaluated as follows:

The burden rate for direct expenses was computed by dividing actual expenses by actual hours. This is the same procedure which was previously followed in 1951 and 1953. Since direct expenses were equated with variable expenses, this was proper procedure.

The burden rate for the fixed-four expenses was computed by dividing actual expenses by normal standard hours. This was not the same procedure followed in 1951 and 1953 when the higher of actual hours or normal standard hours was used. Since fixed expenses were equated with the fixed-four, this revised procedure was also proper.

The burden rate for other indirect expenses was computed in the same way as the fixed-four, actual expenses were divided by normal standard hours. This also was not the same procedure followed in 1951 and 1953 when actual expenses were divided by actual hours and not normal standard hours. This revised procedure was erroneous.

The crux of the problem presented in analyzing plaintiff's 1956 burden rates is to identify the accounting characteristics of plaintiff's other indirect expenses. The question involved is whether these expenses are fixed or variable. If all or substantially all of these expenses are fixed, the procedure followed is proper. However, if all or substantially all of these expenses are variable, as is the case here, this procedure is grossly erroneous. Under proper application of the practical capacity method, the burden rate for variable expenses can be computed either (1) by dividing capacity expense dollars by capacity actual earned hours, or (2) by dividing actual expense dollars by actual earned hours. It cannot be computed by dividing actual expense dollars by capacity earned hours (or normal standard hours). Such erroneous computation necessarily results in a burden rate that will not even absorb the very expenses on which it is based. Indeed, when the actual expenses used are incurred at a substantially reduced level of operating activi-

ty, the magnitude of the resulting error is enormous.

The nature and impact of this error may be illustrated by an example used at trial and based on the following hours and expenses:

| | | |
|---|---|---|
| a. | Normal Standard Hours | 25,000 |
| b. | Actual Earned Hours (70%) | 17,500 |
| c. | Indirect Expenses: | |
| | (1) Fixed-Four | $ 50,000 |
| | (2) Other (if variable) | 100,000 |
| d. | Total Indirect Expenses | $150,000 |

Based on these hours and expenses, the computations of the burden rates for both the practical capacity method and the plaintiff's erroneous method are as follows:

### a. *Practical Capacity Method*

| | | |
|---|---|---|
| (1) Fixed-Four Expenses | $ 50,000 | |
| (2) Normal Standard Hours | 25,000 | |
| (3) Burden Rate for Fixed-Four (1 ÷ 2) | | $2.00 |
| (4) Other Indirect Expenses | $100,000 | |
| (5) Actual Earned Hours | 17,500 | |
| (6) Burden Rate for Other Expenses (4 ÷ 5) | | 5.70 |
| (7) Normal Burden Rate for Total Indirect Expenses | | $7.70 |

### b. *Plaintiff's Erroneous Method*

| | | |
|---|---|---|
| (1) Total Indirect Expenses | $150,000 | |
| (2) Normal Standard Hours | 25,000 | |
| (3) Normal Burden Rate for Indirect Expenses (1 ÷ 2) | | $6.00 |

The different amounts of unabsorbed burden that result from applying the different burden rates computed above are compared as follows:

| | | Practical Capacity Method | Plaintiff's Erroneous Method |
|---|---|---|---|
| a. | Total Indirect Expenses | $150,000 | $150,000 |
| b. | Actual Earned Hours | 12,500 | 12,500 |
| c. | Normal Burden Rate | $7.70 | $6.00 |
| d. | Absorbed Burden (b. x c.) | 96,250 | 75,000 |
| e. | Unabsorbed Burden or Idle Plant (a. – d.) | $ 53,750 | $ 75,000 |
| f. | Difference (Unabsorbed Variable Expenses) | | −53,750 |
| | | | $ 21,250 |

This example shows that plaintiff's erroneous method of computing burden for other indirect expenses results in an overstatement of unabsorbed burden in the amount of $21,250 (approximately 30 percent). This amount ($21,250) clearly represents variable expenses that should have been absorbed as part of the cost of production under a proper application of the practical capacity method.

The above example was grounded on the facts of this case. Plaintiff's average level of productive activity during the fifteen-month period on which the 1956 rates were based was approximately 70 percent. This is the percentage used here. The relative proportion of the fixed-four expenses to other indirect expenses during this base period is approximately 1:3. The proportion used in this example (1:2) is conservative. Prior to 1956, both plaintiff and its independent auditors viewed and treated the fixed-four as being "the fixed expense of this company at that time." The same assumption is made here.

The evidence shows that plaintiff did not absorb its variable expenses, i. e. F.I.C.A. tax, vacation pay, holiday pay, and unemployment insurance. The evidence further shows that these variable expenses were not absorbed because the new burden rates were pegged at significantly less than the actual incurred cost per hour in 1955.

The evidence also shows that the 1956 burden rates were too low because the 1956 budget was developed from dollar

amounts which were never restated to practical capacity.

The evidence finally shows that the impact of this error on plaintiff's unabsorbed burden here has been enormous.

Another fundamental error made by plaintiff was its failure to adjust its burden rate at reasonable intervals to reflect current conditions. Evidence of this failure may be seen by comparing actual expenditures with budgeting assumptions, or even by comparing the successive magnitudes of the respective burden budgets used. The evidence shows that substantial amounts of man hour variable costs remained unabsorbed at the end of each year in issue here, and that the total amounts of unabsorbed burden that plaintiff claims represent idle or excess capacity expenses here even exceed the total amounts of fixed-four costs that were budgeted for these same years.

Under the proper application of the practical capacity method, variable expenses should be absorbed. Plaintiff's failure to absorb its variable expenses, therefore, cannot be attributed to the practical capacity method. If standard costs are to be used for valuing inventory in a balance sheet, these standard costs must be adjusted at reasonable intervals to reflect current conditions. Plaintiff's failure to make an adjustment to reflect current conditions, therefore, is not a deficiency to be attributed to the practical capacity method. The plaintiff's own faulty procedures, and not the practical capacity method, are responsible for the enormous and obviously overstated amounts of unabsorbed burden being claimed as idle or excess plant expenses here.

## THE APPLICATION OF THE PRACTICAL CAPACITY METHOD TO PLAINTIFF'S OPERATIONS

Plaintiff makes a wide variety of engines with a wide variety of applications for a wide variety of purposes with a wide variety of fuels. Much of the plaintiff's manufacturing, engineering, and sales activity revolves around a customized product built to a specific customer's requirements. While plaintiff has about twenty basic models of engines, there are an indefinitely large number of variations that can be made within each basic model. These variations include different rates of horsepower (15 horsepower to 1,000 horsepower or better), different speeds (900 r. p. m. average up to 1,800 or 2,200), different fuels (gasoline, fuel oil, both gasoline and fuel oil, natural gas, and kerosene), different end uses (oil fields, municipal plants, construction machinery, agriculture, automotive, logging, marine, and air conditioning), and even differences that are dictated by the place where an engine is likely to be used.

Throughout the years in issue here, practically every engine had a separate specification and was designed or adapted for a specific use in a specific industry. A typical engine has 1,200 parts. Because of differences in engine models, as well as differences in customer specifications, however, plaintiff purchases or makes literally thousands of different engine parts. Each part manufactured involves an average of five operations for each part. For its many thousands of parts which are manufactured, plaintiff has prepared what is known as an operation sheet or routing slip. Plaintiff has approximately 30,000 operation sheets. To manufacture these parts and assemble them into completed engines, plaintiff has approximately forty-four direct producing departments and even a larger number of indirect support departments.

Because of the range and depth of plaintiff's products, it is almost, if not next to impossible, to determine with any degree of precision what the sales of the many specific models and variations of models and final assembly are going to be. Both sales and production are subject to significant variation from year to year. Even month-to-month variation is very significant. There are wide swings and variations in product classes and products as they come through the plant. These swings and

variations cause major fluctuations in various departments and, consequently, in the different machinery, equipment, and personnel going to be used. These swings and variations are further complicated by such factors as seasonal flows, customer priorities, experimental orders, and parts necessary for maintenance for both old and new engines. As plaintiff's president stated, these are "not only variations, but significant variations from a production point of view." If plaintiff were to expand to take on every conceivable mix of product line which causes these violent fluctuations in departments, it could conceivably have a plant eight to ten times as large. Accordingly, on occasion it runs second shifts in some cases or runs into tremendous overtime, or both.

Plaintiff's procedures for estimating its practical capacity are described in one of the exhibits as follows:

"*Normal Hours*—The normal hours for each direct department were computed by obtaining from the departmental foremen estimates of their normal crew and downtime factors. These were multiplied together, and the product multiplied by 1960 hours (for 49 weeks at 40 hours per week) and by productive ability factors based on the average productive ability for each department over the 18 months ended January, 1956. The resulting product was the normal hours for the department."

This procedure may be summarized and expressed by the following formula:

$$\text{Normal Hours} = \text{Normal Crew} \times \text{Downtime Factors} \times \text{Hours Per Year} \times \text{Productive Ability}$$

The estimates of *normal crew* and *downtime factors* were made in two different ways. For machine shops, questionnaires were distributed to and filled in by the departmental foremen. For plaintiff's assembly and test departments, office estimates were used.

The *hours per year* figure is the product of the number of weeks that the plant operates during the year times the standard 40-hour work week. In 1956, the plant operated forty-nine weeks. It is usually closed for three weeks during the summer for annual maintenance and repairs, employee vacations, and inventories. The number of working hours used in 1956 was accordingly forty-nine weeks times 40 hours per week for a total of 1,960 hours.

The *productive ability* factor varied. Prior to 1956, a flat factor of 150 percent was used. In the 1956 rate revision, however, this factor was computed on a departmental basis from departmental efficiency records.

The evidence shows considerable uncertainty and inaccuracy in most of the various estimates that plaintiff used to compute its practical capacity. In view of the complex and ever-shifting nature of plaintiff's manufacturing operations, it is evident that this uncertainty and inaccuracy could not have been avoided. I accordingly find that the practical capacity method is not appropriate for valuing plaintiff's inventories for federal income tax purposes.

The whole theory and purpose of the practical capacity method is to separate idle or excess capacity expense from other production expenses. By definition, idle or excess capacity expenses represent fixed expenses that are not absorbed whenever a manufacturing operation fails to attain practical capacity. If fixed expenses cannot be identified, idle or excess capacity expenses cannot be identified either. Vital as this concept is to the theory and proper application of the practical capacity method, plaintiff and its professional witnesses made no attempt to determine which of its manufacturing expenses were fixed and which were variable.

## CONCLUSIONS OF LAW

The adjustments made by the revenue agents were the only possible adjustments that could be made under the circumstances of this case and were based on the full absorption, or all-inclusive, method of cost accounting. Under this method "the entire amount of overhead expense attributable to production was included [as a product cost]," and this was in accord with leading authorities in the accounting field. See Hoffman, "Inventories, A Guide to Their Control, Costing and Effect Upon Income and Taxes." That the adjustments made were proper adjustments under the full absorption method is not disputed. What is disputed is the propriety of the full absorption method itself.

The use of the full absorption method of accounting for determining the value of inventories is well settled. The adjustments necessary to value plaintiff's inventories properly under the practical capacity method cannot be determined in this case because the accounting information and analysis necessary to do this are not available.

Both the accounting profession and the courts recognize the full absorption method for determining the values of inventories. In Photo-Sonics, Inc. v. Commissioner of Internal Revenue, 42 T.C. 926 (1964), affirmed 357 F.2d 656 (9th Cir. 1966), the taxpayer, using the prime cost method of accounting, excluded all burden expenses in determining the value of its inventories (cameras). Seventeen different burden expense items were excluded. Four of these excluded expense items were fixed while the others were variable. The Commissioner adjusted the value of the taxpayer's inventories by using the full absorption method. The tax court sustained the Commissioner's adjustment. The appellate court, in affirming, expressly approved the full absorption method and stated that this method "seems now to be preferred by most American accountants." 357 F.2d at 658.

In Frank G. Wikstrom & Sons, Inc. v. Commissioner of Internal Revenue, 20 T.C. 359 (1953), the taxpayer was also using the prime cost method, and the Commissioner again adjusted the value of the taxpayer's inventories by using the full absorption method. The taxpayer contended that the use of the full absorption method was "unreasonable and arbitrary when applied to a business like its own in which all products are made on special orders." 20 T.C. at 361. The tax court rejected this contention. A similar problem was presented and a similar result was reached in a more recent tax court case. Dearborn Gage Co. v. Commissioner of Internal Revenue, 48 T.C. 190 (1967).

Contrary to plaintiff's contention, the validity of the full absorption method for determining the value of inventories is recognized and established. No court has ever rejected the general merits of this method.

The accounting adjustments required to value plaintiff's ending inventories properly under the practical capacity method cannot be determined in this case because the accounting information and analysis necessary to do this are not available.

The amounts of unabsorbed burden claimed as income tax deductions here are very substantial. They total approximately eleven million dollars during the six years in issue. Plaintiff contends that substantially all of this eleven million dollars represents "the expense of not attaining practical capacity." I reject the validity of this conclusion. I do not doubt that *some* of plaintiff's unabsorbed burden may represent "idle or excess capacity expense" as that concept is defined and computed under the practical capacity method. The problem presented here, however, is to determine how much. Plaintiff's own expert witness acknowledges that this determination cannot be made from the accounting information and analysis available. Accordingly, it follows that the adjustments required to value plaintiff's ending inventories properly under the practical capacity method cannot be made in this case.

The numerous accounting problems which would confront any auditor of plaintiff's unabsorbed burden accounts for the years in issue here were extensively developed during trial.

The first problem confronting the auditor would be to understand what procedures were followed. This would be extremely difficult. Plaintiff not only did not have any office manual describing its "standard operating accounting procedures" that an auditor could "pick up and read," but even the short summary statements of plaintiff's procedures contained a number of substantial errors.

One exhibit inaccurately described plaintiff's procedure for computing the 1951 burden rate for its direct expenses as follows:

> "*Direct Expenses*—The hourly rate for direct expenses was determined by dividing the actual expense for the 44 weeks by the higher of total actual earned hours or total normal hours for the 44-week period." (Ex. 32, p. 3)

This statement is erroneous. The evidence established that this rate was determined by dividing actual expenses by actual earned hours. The exhibit also described plaintiff's procedure for computing the 1951 burden rate for indirect expenses as follows:

> "The indirect expenses allocated to the direct departments were divided by the normal hours for the department to compute the normal rate per hour for indirect expenses." (Ex. 32, p. 4)

This statement is also erroneous in two respects. The fixed-four expenses were divided by the higher of actual or normal hours. Other indirect expenses were divided by actual hours.

The second problem confronting an auditor would be to understand the plaintiff's working papers. Even Mr. Downey, plaintiff's expert witness, had difficulty doing this. There were "a substantial number of clerical errors." Some adjustments were made that "there was no way to trace." There were other adjustments that Mr. Downey "[didn't] necessarily agree with" and still others that were probably "mistakes." Mr. Miller, another expert witness, had similar difficulties. He also found various "adjusted amounts" in the working papers which "indicate[d] they were computed, [but] we were not able to find the pattern or the key to the computation."

The third problem confronting an auditor would be the lack of sufficient departmental information to make any valid analysis of plaintiff's unabsorbed burden. Plaintiff's own company accountants tried to make such an analysis of plaintiff's unabsorbed burden account for at least two of the years involved here. Mr. Downey rejected both analyses as invalid because they were based on plaintiff's plant as a whole and not based on sufficiently detailed departmental information.

The first company analysis was entitled "Waukesha Motor Company Computation on Unabsorbed Burden due to Unused Plant." Mr. Downey peremptorily rejected this analysis as mere "doodling." The reasons given to support this characterization were two: First, "It's not an official document," and second, "they did not analyze specifically by department what had happened." Mr. Downey explained further the second objection as follows:

> " * * * [A]ny analysis [of] the plant in its entirety just cannot be valid in the circumstances [of this case]. (Tr. p. 494)

The second company analysis was part of the plaintiff's "official" working papers for its 1953 burden rate study. Mr. Downey, again, rejected the validity of this analysis, however, on the grounds that sufficient departmental detail was lacking. In the recross-examination of Mr. Downey, he was asked whether "a detailed department analysis" was really necessary "in order to know what * * * [plaintiff's unabsorbed burden] represents." Mr.

Downey eventually answered this question by stating:

> "I would say in order to draw conclusions which are valid in line with accounting theory, you would have to go back to a rather substantial detailed departmental basis." (Tr. p. 519)

Such substantial detailed departmental basis was not available here.

The fourth problem confronting an auditor would be "the complete absence of any studies" showing which of plaintiff's expenses were fixed and which were variable. This deficiency alone should be decisive in this case. The whole theory and purpose of the practical capacity method is to separate "idle or excess capacity expense" from other production expenses. By definition, "idle or excess capacity expenses" represent fixed expenses that are not absorbed whenever a manufacturing operation fails to attain practical capacity. If fixed expenses cannot be identified, idle or excess capacity expenses cannot be identified either. Vital as this concept is to the theory and proper application of the practical capacity method, neither plaintiff nor its professional witnesses have made any attempt to determine which of plaintiff's production expenses are fixed and which are variable. Mr. Downey informed us that—

> "Waukesha Motor Company does not go into a detailed analysis  * * in their burden studies of the difference between fixed and variable expense." (Tr. p. 232)

Mr. Downey also informed us that his own team of experts "did not attempt to break down the fixed and variable expenses."

It is accordingly clear that plaintiff's inventories here could not be valued properly by the practical capacity method and that the adjustments made by the revenue agents were the only possible adjustments that could be made under the circumstances.

Plaintiff has failed to sustain its required burden of proof, for to prevail in a civil action for refund of income taxes alleged to have been overpaid, a plaintiff must not only show that the Commissioner's adjustments were erroneous but must also establish all facts essential to a correct determination of the amount that is due. In Roybark v. United States, 104 F.Supp. 759, 762 (S.D.Cal.1952), the court pointed out that:

> "Not only must the plaintiff show that the Commissioner was wrong, but he must go further and establish the essential facts from which a correct determination of his tax liability can be made. * * * The taxpayer must show that he has overpaid his tax and that involves a redetermination of his entire tax liability. * *
>
> * * * * * *
>
> "There can be little doubt that the theory behind the Commissioner's assessment was legally wrong, but that is not sufficient. * * * The Commissioner resorted to speculation or guess-work in determining what part of plaintiffs' cost of sale was in excess of the ceiling prices, and in disallowing same, but I cannot resort to such speculation in determining what part of the assessment is unjustly held by the government. Because plaintiffs have failed to sustain their burden of proof and have failed to prove their actual income for either year, I must find for the defendant * * *."

This decision was affirmed on appeal. Roybark v. United States, 218 F.2d 164 (9th Cir. 1954). The *Roybark* holding, and the burden which it places on the taxpayer, has also been cited, approved, and adopted by other courts of appeals and the court of claims. United States v. Pfister, 205 F.2d 538, 542 (8th Cir. 1953); United States v. Harris, 216 F. 2d 690, 691 (5th Cir. 1954); Compton v. United States, 334 F.2d 212, 218–219 (4th Cir. 1964); Dysart v. United States, 340 F.2d 624, 629–630, 169 Ct. Cl. 276 (1965). It has also been cited and approved by this court. Schwarz v.

United States, 138 F.Supp. 841, 843 (D.C.1956).

■ This presumption in favor of the Commissioner's assessment of tax liability is even stronger where the taxpayer is challenging the Commissioner's method for valuing inventory. Lucas, Commissioner v. Kansas City Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848 (1930); F. & D. Rentals, Inc. v. Commissioner of Internal Revenue, 365 F.2d 34, 40–41 (7th Cir. 1966), cert. denied 385 U.S. 1004, 87 S.Ct. 707, 17 L.Ed.2d 543 (1967); Commissioner of Internal Revenue v. Joseph E. Seagram & Sons, Inc., 394 F.2d 738, 743 (2d Cir. 1968). Here, the Commissioner's method must be shown to be clearly and plainly arbitrary.

Plaintiff has not only failed to show that the Commissioner's use of the full absorption method for valuing its inventories was clearly arbitrary but has also failed to establish the accounting data and adjustments that would be required to value its inventories properly under the practical capacity method. Plaintiff contends that expenses of unused capacity are not costs of production and that substantially all of plaintiff's unabsorbed burden for the twelve-year period from 1948 through 1959 represented idle or excess capacity expense. Plaintiff introduced as evidence a series of charts showing the theory underlying the practical capacity method and its burden expenses (both absorbed and unabsorbed) and its production levels for this same twelve-year period, 1948–1959. The evidence presented not only fails to sustain plaintiff's required burden of proof but, on analysis, even refutes the contention and the conclusion for which it was offered.

Accounting analyses and *not* accounting assumptions are necessary to sustain plaintiff's burden of proof. Since we would have to go back to a rather substantial departmental analysis of plaintiff's unabsorbed burden in order to draw conclusions which are valid in line with accounting theory, and since no detailed analysis of every individual department was ever made during the periods in question, plaintiff, under the accounting standards prescribed by its own expert witness, has clearly failed to sustain its required burden of proof in this case.

## CONCLUSION

■ There is substantial disagreement within the accounting profession as to whether practical capacity should be used for allocating burden. Moreover, even among the accounting authorities who do advocate using practical capacity, there are fundamental differences of opinion as to whether "normal" capacity should be based on physical facilities ("attainable" capacity to make) or on normal sales expectancy ("anticipated" capacity to sell). When the concept of practical capacity method is used, however, all accounting authorities agree that the burden rate must be "determined by relating normal overhead costs to normal production activity levels."

The plaintiff here has failed to establish that the Commissioner's adjustments of its inventory values were clearly erroneous. Indeed, the evidence establishes the contrary. The adjustments made by the Commissioner under the full absorption method were the only adjustments that could have been made in the circumstances presented here. Even if the adjustments made had been shown to be clearly erroneous, however, plaintiff still failed to establish the essential facts for a correct determination of its inventory values under the practical capacity method.

It is therefore ordered that this action be and it hereby is dismissed, and the clerk of court shall enter judgment in accordance with the stipulation filed by the parties.

The foregoing constitutes this court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.