**THOR POWER TOOL COMPANY,**
**Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 76–1476.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1976.
Decided Sept. 29, 1977.

Mark H. Berens, Chicago, Ill., for petitioner-appellant.

Crane C. Hauser, Chicago, Ill., for amicus curiae.

Scott P. Crampton, Asst. Atty. Gen., William A. Whitledge, Atty., Tax Div., Dept. of Justice, Meade Whitaker, I. R. S., Washington, D. C., for respondent-appellee.

Before TONE and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

TONE, Circuit Judge.

Thor Power Tool Company appéals from a decision of the United States Tax Court, 64 T.C. 154 (1975), which upheld the Commissioner's disallowance of portions of Thor's write-down of its closing inventory for 1964 and its 1965 addition to a reserve for bad debts.[1] The issues presented involve the income tax treatment of "excess" inventory and the method for calculating a reasonable addition to a bad debt reserve. We affirm.

I. *Inventory*

A.

Thor manufactures tools and parts at three plants in its Tool Division and various rubber articles at a fourth plant in its Rubber Division. The corporation also maintains 24 sales and service branches in the United States and Canada. Inventories of parts, accessories, and completed tools are maintained at all branches and at the three Tool Division plants. Those three plants also maintain inventories of raw materials and work-in-process. The single Rubber Division plant keeps inventories of raw materials, work-in-process, and completed

---

[*] The Honorable William J. Campbell, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

[1] Because the extensive write-downs taken for 1964, see text, *infra*, resulted in an operating loss for that year, part of which was carried back to 1963, the tax deficiency resulting from the Commissioner's disallowance was for 1963. The bad debt reserve issue relates to the taxes for 1965.

products.[2] Much of the inventory consists of replacement parts and accessories.

When Thor discontinued the manufacture of tools of a particular model, it nevertheless continued to stock replacement parts and accessories for tools of that model that were still in service. Thor began amortizing its cost of inventories of replacement parts and accessories for out-of-production tools in its 1960 tax return. This was accomplished by establishing an inventory contra account on the books of the company, and crediting that account with ten percent of the value of a part or accessory for each year since the termination of production of the tool of which the part or accessory was a component. The closing inventory was then written down to reflect this account, thereby increasing the cost of goods sold and reducing the reported net income. This practice was continued in the 1961, 1962, 1963 tax returns, without a challenge from the Commissioner. Further additions to the account were made for the first three quarters of 1964.[3]

In December of 1964 new management assumed the reins at Thor.[4] As part of its preparation of the 1964 financial statements, "a complete re-evaluation of the assets and liabilities of the company" was undertaken, including "a physical inventory . . . at all locations . . . ." The inventory was then "priced at 1964 inventory standards . . . ." Once this was completed the management began to adjust the inventory valuation, in order to show the inventory at its "net realizable value," as required by the standards of the accounting profession, and to price the inventory at "the lower of cost or market," as had been Thor's practice for income tax purposes.

Write-downs totaling about $2,750,000 were made for obsolescence[5] and other reasons. These were not questioned by the Commissioner, because the items in question were scrapped soon after they were deleted from the 1964 closing inventory. A write-down of $245,000 was made for parts for three recent products that had not sold as well as expected. This too went unchallenged because the products were sold at lowered prices soon after the write-down.

The remaining inventory, consisting of some 44,000 items, was evaluated for the purpose of ascertaining the extent to which it too was in excess of anticipated demand. Relying on its experience with manufacturing businesses, the new management estimated future demand for these items. At two of the Tool Division plants, estimates were based on 1964 sales figures, resulting in write-downs of $744,030.[6] Owing to the inadequacy of sales data for the other two plants, flat percentage adjustments were made to the valuations for parts, raw materials, work-in-process, and finished products

---

**2.** The Tax Court observed that inventories of undetermined size were also maintained by Thor's distributors and several major customers. None of those inventories are involved in this case.

**3.** A total of $152,117 was credited to the inventory contra account, and hence subtracted from net income, during 1960–63. Another $22,090 was credited to the account during the first three quarters of 1964, for subtraction at the close of that year.

**4.** A proposed merger of Thor into Stewart-Warner Corp. fell through in early December 1964, apparently because an investigation and audit convinced Stewart-Warner that Thor's assets were overstated. The purchase agreement between the two companies was rescinded by mutual agreement at that time, and Stewart-Warner agreed to provide management assistance to Thor. Accordingly, a Stew-

art-Warner employee assumed the presidency of Thor on December 14, 1964.

**5.** All parts of tools which had never been offered for sale and parts for which there had been no demand during 1964 were considered to be "obsolete."

**6.** The gross usable inventory at these plants was reduced as follows:

(1) Items not in excess of 12 months' anticipated demand were not written down.

(2) Items in excess of 12 months' anticipated demand but not in excess of 18 months' anticipated demand were written down 50 percent.

(3) Items in excess of 18 months' anticipated demand but not in excess of 24 months' anticipated demand were written down 75 percent.

(4) Items in excess of 24 months' anticipated demand were written off completely.

in the physical inventory, resulting in write-downs of $160,832.[7] The $22,090 credit which the old management had entered in the inventory contra account for the first three quarters of 1964, see note 3, *supra*, was also subtracted from closing inventory.

These last three adjustments were disallowed by the Commissioner, as not "clearly reflecting the income" for 1964.[8] The Tax Court upheld the Commissioner, on the ground that Thor's write-down of excess inventory was not permitted by the Treasury Regulations.

### B.

■ Section 446 of the Internal Revenue Code, 26 U.S.C. § 446, provides that taxes shall be computed in accordance with the taxpayer's usual method of accounting, unless that method does not clearly reflect income.[9] The taxpayer's method of accounting is thus given preference. *Lincoln Electric Co. v. Commissioner*, 444 F.2d 491, 494 (6th Cir. 1971); *Photo-Sonics, Inc. v. Commissioner*, 357 F.2d 656, 658 n. 1 (9th Cir. 1966). If, however, in the opinion of the Commissioner, that method does not clearly reflect income, the Commissioner may require that another method be used. *Brown v. Helvering*, 291 U.S. 193, 203, 54 S.Ct. 356, 78 L.Ed. 725 (1934); *Bangor Pun-*

*ta Operations, Inc. v. United States*, 466 F.2d 930, 935 (7th Cir. 1972).[10] The Commissioner possesses "broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner v. Hansen*, 360 U.S. 446, 467, 79 S.Ct. 1270, 1282, 3 L.Ed.2d 1360 (1959).

■ The Commissioner's discretion is, if anything, greater with respect to inventory accounting. *Waukesha Motor Co. v. United States*, 322 F.Supp. 752, 768 (E.D. Wis.1971). Section 471, 26 U.S.C. § 471, provides:

"Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

The statute thus sets up a two-part standard on which the Secretary or his delegate, the Commissioner, is to act: the taxpayer's inventory method must both conform closely to the relevant "best accounting practices" and clearly reflect income. These two are usually linked, however, because an

---

7. Inventory was reduced by: (1) five percent for tool parts and motor parts at the third plant; (2) ten percent for raw materials, manuals and name plates, and work-in-process at this plant; (3) fifty percent for hardware at this plant; and (4) ten percent for raw materials, work-in-process, and finished goods at the fourth plant.

8. The statutory notice of deficiency received by Thor initially indicated a disallowance of $1,079,069, which was the total credit balance in Thor's inventory contra account at the close of 1964. This figure was derived by adding the above described credits to the account taken during 1964, which totaled $926,952, to the year-end 1973 account credit balance of $152,-117.

The credit balance in the inventory contra account at the end of each year was reflected on Thor's income tax return for that year as a reduction of closing inventory. Thus, only the net addition to the account during any particular taxable year increased Thor's cost of goods sold and reduced its taxable income for that year. Inasmuch as the Commissioner was only

challenging Thor's 1964 return, yet the deficiency notice also included the 1964 opening balance, the Commissioner conceded before the Tax Court that only the credits totaling $926,-952 were at issue. The Commissioner did not, however, concede the propriety of the methods by which the 1964 opening account credit balance was obtained. We express no views on this.

9. 26 U.S.C. § 446:

" . . . Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books . . . [unless] the method used does not clearly reflect income, [in which case] the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income."

10. Treas.Reg. § 1.446–1(a)(2) provides, *inter alia*, that "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income."

accounting method which "reflects the consistent application of generally accepted accounting principles in a particular trade or business . . . will ordinarily be regarded as clearly reflecting income . . ." Treas.Reg. § 1.446–1(a)(2). The same principle was applied to inventory accounting in a sentence which appeared in the regulations until 1973:

> "An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income."

Treas.Reg. § 1.471–2(b).[11] See also *Commissioner v. Joseph E. Seagram & Sons, Inc.*, 394 F.2d 738, 742–743 (2d Cir. 1968).

 As the words "ordinarily" and "as a general rule," and the two-part standard itself, suggest, however, there can be circumstances in which the best accounting practice does not clearly reflect income. Thus the accounting profession's indorsement of a practice as "the best accounting practice," even if accepted by the Commissioner, does not require him to determine that the practice clearly reflects taxable income. *Schlude v. Commissioner*, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963); *American Automobile Association v. United States*, 367 U.S. 687, 693, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961). This is because the goals of balance-sheet and income-tax accounting are not identical. Mr. Justice Clark, in *American Automobile Association v. United States, supra*, speaking of the accounting system before the Court, said that it "presents a rather accurate image of the total financial structure, but fails to respect the criteria of annual tax accounting and may be rejected by the Commissioner." 367 U.S. at 692, 81 S.Ct. at 1730. The criteria referred to were stated by Mr. Justice Brandeis in *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 268, 50 S.Ct. 263, 265, 74 L.Ed. 848 (1930):

> "The Federal income tax system is based upon an annual accounting period. This requires that gains or losses be accounted for in the year in which they are realized. The purpose of the inventories is to assign to each period its profits and losses."

Whether a given method of accounting clearly reflects income is a question of fact. *Artnell Co. v. Commissioner*, 400 F.2d 981, 983–985 (7th Cir. 1968). As the Supreme Court has stated, it is not our role, in reviewing the Commissioner's exercise of his discretion, "to weigh and determine the relative merits of systems of accounting." *Brown v. Helvering, supra*, 291 U.S. at 204–205, 54 S.Ct. at 361. Thus, in order to overturn the Commissioner's disallowance, the taxpayer must show that the Commissioner's act was "plainly arbitrary." *Lucas v. Kansas City Structural Steel Co., supra*, 281 U.S. at 271, 50 S.Ct. 263; *Bangor Punta Operations, Inc. v. United States, supra*, 466 F.2d at 935.

### C.

The Tax Court held in this case that under § 471 of the Internal Revenue Code of 1954 the Secretary is to prescribe the methods by which inventories are to be taken, and that the Treasury Regulations set forth those methods. While the court found that Thor's write-downs of excess inventory constituted a "best accounting practice" within the terms of the statute, it also held, without elaboration, that Thor had failed to establish that its inventory accounting clearly reflected its 1964 income, thus falling outside the general language of the regulations. The Tax Court therefore required Thor to demonstrate that its method satisfied one of the specific regulations. Because the regulations did not authorize Thor's treatment of its "excess inventory," the court upheld the Commissioner.[12] Thor

---

11. In 1973 this sentence was deleted by an amendment which the Tax Court properly held inapplicable to the case at bar. That amendment also added the requirement that accounting methods be "consistent with" the regulations to Treas.Reg. § 1.446–1(c)(1)(ii). See T.D.

7285 (approved Sept. 13, 1973), 1973–2 Cum. Bull. 163.

12. The Tax Court therefore did not reach the Commissioner's alternative arguments, *viz.*, that Thor's new inventory valuation procedures

argues that the Tax Court erred in not allowing it to take advantage of a "presumption" that best accounting practice will clearly reflect income. Thor contends this was created by the sentence formerly included in Treas.Reg. § 1.471–2(b). See text at note 11, *supra*. Thor also argues that the court erred in requiring it to demonstrate that its inventory accounting was explicitly authorized by the regulations, and in holding that the regulations did not authorize the method used.

The Tax Court's finding that Thor's treatment of inventory for 1964 conformed to best accounting practice is not clearly erroneous and is not seriously challenged by the Commissioner. The remaining issues relate to whether that treatment most clearly reflected income and can best be discussed in the following sequence: (1) Was Thor's treatment authorized by specific regulations? (2) Was it authorized by general regulations? (3) If it was neither authorized nor forbidden by any regulations, and the Commissioner nevertheless was required to determine whether it clearly reflected income,[13] did he abuse his discretion in determining that it did not? We answer these questions, in the negative and then go on to hold, see (4), *infra*, that the Commissioner did not abuse his discretion in determining that inventory which was not yet scrapped could not be written off for tax purposes.

### (1)

We uphold the Tax Court's determination that Thor's write-downs of excess inventory did not fall within the specific regulations. Treasury Regulation § 1.471–2(c) permits the taxpayer to use special valuation procedures for inventory goods which the taxpayer proves are "unsalable at normal prices . . . because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes . . . ." Thor failed to carry its burden of proving that its excess parts and accessories were within the descriptive phrase. *E. W. Bliss Co. v. United States*, 224 F.Supp. 374, 378 n. 1 (N.D.Ohio 1963), *aff'd on the opinion below*, 351 F.2d 449 (6th Cir. 1965). We accept the view of the Commissioner and the Tax Court that the words "other similar causes" do not extend the coverage of the regulation to units which, in management's opinion, are "excess." As the Tax Court observed, excess inventory is not distinguishable from other units of inventory. All the tool parts and accessories were in essentially the same condition—they were commingled and interchangeable. See *Lucas v. Kansas City Structural Steel Co., supra*, 281 U.S. at 270–271, 50 S.Ct. 263. See also *Cleveland Automobile Co. v. United States*, 70 F.2d 365, 368–369 (6th Cir.), *cert. denied*, 293 U.S. 563, 55 S.Ct. 88, 79 L.Ed. 663 (1934). Moreover, at least with respect to the finished products, Thor did not meet the valuation requirements of this regulation. No "actual offering" at below "normal prices" was made within 30 days of the inventory, and therefore no bona fide selling price could be calculated.[14] Thor cannot be permitted to do what the Sixth Circuit forbade in *Cleveland Automobile Co. v. United States, supra, viz.*,

"by a consideration of all factors then known and those later discovered . . . thus substitute for the actual selling price required by the regulation a supposititious selling price which the Commissioner and the court must accept because it conforms to good accounting practice."

---

constituted a change in its method of accounting, without the Commissioner's permission, and was therefore impermissible, or that Thor's 1963 income was not clearly reflected because it failed to revalue its 1964 opening inventory in accordance with the methods used to value its closing inventory.

**13.** We assume that if a particular situation is not covered by a general or specific regulation, the Commissioner would nevertheless be obli-

gated to apply the two-part standard to the facts of that case. Section 471, in speaking of the individual taxpayer, suggests as much.

**14.** Treasury Regulation § 1.471–2(c) provides that unsalable goods "should be valued at bona fide selling prices less direct cost of disposition . . . . Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date."

70 F.2d at 369. See also *John L. Ashe, Inc. v. Commissioner*, 214 F.2d 13, 15 (5th Cir. 1954).

■ Nor does the excess inventory come within Treas.Reg. § 1.471–4.[15] As noted above, the units of excess inventory are "normal" goods, unlike the custom-built presses involved in the *Bliss* case, on which Thor chiefly relies. The fact that they may be in excess of Thor's future needs is not an exceptional circumstance permitting their market valuation to be set at other than their replacement cost. *Knapp King-Size Corp. v. United States*, 527 F.2d 1392, 1399–1400 (Ct.Cl.1975); *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776 (1960), *aff'd on opinion below*, 296 F.2d 732 (6th Cir. 1961), *cert. denied*, 369 U.S. 860, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962). Thor's own chief executive officer stated that "any business which is involved in the manufacture and sale of products inevitably must have excess inventory," that this was particularly true in "the kind of business that Thor was in . . . which involves a very high percentage of service parts and accessories," and that many manufacturing costs are "independent of quantity." Furthermore, a senior member of a leading accounting firm who was called as an expert by Thor testified that "most corporations in that type of business do carry a fairly good inventory in terms of quantities and diversified parts for most of their models . . . ." Thus, in Thor's business it was considered wise to produce in advance all the parts that were expected to be sold over several succeeding years.[16] Of necessity, these parts were then carried in inventory. Therefore, we cannot say that the Tax Court erred in holding that the accumulation of excess inventory is not an extraordinary circumstance justifying valuation of inventory under Treas.Reg. § 1.471–4(b) in a manufacturing business such as Thor's, with its extensive inventory accumulated for service and repair purposes.[17]

(2)

■ As we have noted, the regulation dealing with accounting practices generally, Treas.Reg. § 1.446–1(a)(2), and the former provision in the regulation dealing with inventory, Treas.Reg. § 1.471–2(b), simply provide that the best accounting practice will ordinarily produce a result that most clearly reflects income. Thor contends that these provisions established a presumption in its favor. The weakness in this argument is exposed, however, by the sentence in the latter regulation which immediately precedes the sentence on which Thor relies. That preceding sentence is as follows:

> "In order to clearly reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is in accord with sections 1.471–1 through 1.471–11."

The Tax Court, although it did not reach the related issue of internal inconsistency during 1964, see note 12, *supra*, did infer that the excess inventory Thor attempted

---

15. This regulation governs inventories valued at the lower of cost or market, as was Thor's. Subsection (a) provides the general definition of "market," which applies "[u]nder ordinary circumstances and for normal goods in an inventory . . . ." Subsection (b) establishes procedures for inventory valuation "[w]here no open market exists or where quotations are nominal, due to inactive market conditions . . . ." In such circumstances "the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales . . . or compensation paid for cancellation of contracts . . . ."

16. As the American Institute of Certified Public Accountants observed in a comment it prepared on proposed amendments to the inventory regulations under § 471, "the cost of producing additional parts, in the event that actual future need is greater than presently estimated, would be prohibitive."

17. Our conclusion is consistent with the AICPA's acknowledgement in its statement on proposed inventory regulations, see note 16, *supra*, that "the problem of determining appropriate cost for inventory quantities in excess of prospective demand" is "[a]n important valuation matter not covered" by the present regulations.

to write off in 1964 had been accumulated "over a period of several years." This inference was appropriate, in view of the fact that the merger with Stewart-Warner was called off in part because Thor's inventory valuation was excessive, see note 4, *supra*, and the fact that the new management adopted a valuation method which resulted in overall write-downs of nearly $4 million in 1964, as compared with a small fraction of that amount in the preceding years. As the Tax Court implied in questioning an expert witness called by Thor, this large discrepancy was enough to indicate that consistency was lacking. Hence if any "presumption" was created by the regulations, it was dissipated by this lack of consistency. Inventory accounting for income tax purposes must serve the ultimate goal of matching costs and revenues so the profit or loss of a particular year is accurately reflected. *United States Cartridge Co. v. United States*, 284 U.S. 511, 520, 52 S.Ct. 243, 76 L.Ed. 431 (1932); *Photo-Sonics, Inc. v. Commissioner, supra*, 357 F.2d at 657. Thus Thor had the burden of proving before the Tax Court that its treatment of inventory more clearly reflected income than did the Commissioner's. *Peterson Produce Co. v. United States*, 205 F.Supp. 229, 241 (W.D.Ark.1962), *aff'd*, 313 F.2d 609 (8th Cir. 1963).

### (3)

■■■■ The Tax Court's finding that Thor did not prove its 1964 income to have been clearly reflected was not clearly erroneous. *Cf. Resnik v. Commissioner*, 555 F.2d 634, 636 (7th Cir. 1977). Thor's argument to the contrary is not supported by the expert testimony it adduced. The highly qualified members of the accounting profession Thor called as experts did not testify that its 1964 income had been clearly reflected in its tax return, or that the accounting method used was necessary in order to state the 1964 income. Thor's independent auditor (who did not become such until 1970) testified merely that his analysis of Thor's 1964–1971 inventory reserves and results of operations demonstrated that Thor's write-offs

of "excess inventory" were not excessive. Neither his testimony nor that of the other experts compelled a finding that the Commissioner had abused his wide discretion.

### (4)

■■■■ Inventory valuation under the lower-of-cost-or-market method adopted by Thor is "a limited exception to the principle of annual accounting." *Space Controls, Inc. v. Commissioner*, 322 F.2d 144, 148 (5th Cir. 1963). In conceding that exception, however, the Commissioner has not abandoned completely the rules that require realization. Thus, the Commissioner requires taxpayers to prove "closed transactions or identifiable events" as a basis for inventory valuations, in order to reduce their opportunities to determine unilaterally how much profit or loss to report in any given year. This is the purpose of Treas.Regs. §§ 1.471–2(c) and 1.471–4(b), which require the taxpayer to offer evidence of valuation, such as discount sales or contract cancellations. Accounting principles may well require that reserves be maintained to reflect declines in value of goods held in inventory, despite the absence of such "identifiable events." But, as Mr. Justice Brandeis observed in *Brown v. Helvering, supra*, 291 U.S. at 201–202, 54 S.Ct. at 360:

> "Only a few reserves voluntarily established as a matter of conservative accounting are authorized by the Revenue Acts. . . . Many reserves set up by prudent business men are not allowable as deductions."

See also *American Can Co. v. Bowers*, 35 F.2d 832, 835 (2d Cir. 1929), *cert. denied*, 281 U.S. 736, 50 S.Ct. 249, 74 L.Ed. 1151 (1930). See generally *United States v. American Can Co.*, 280 U.S. 412, 419, 50 S.Ct. 177, 74 L.Ed. 518 (1930); *Lucas v. American Code Co.*, 280 U.S. 445, 452, 50 S.Ct. 202, 74 L.Ed. 538 (1930). In exercising his broad discretion under § 471, the Commissioner may require that the losses on excess inventory actually be realized, *e. g.*, through scrapping, before they may be subtracted from

sales.[18] That is apparently what he required in this case, as is demonstrated by his allowance of the $245,000 write-down for excess inventories of three products that Thor actually sold off at lower prices. Accordingly, we affirm the judgment of the Tax Court with respect to the inventory valuation issue.

## II. Bad Debt Reserve

The second issue before us involves Thor's 1965 addition to its reserve for bad debts. At the close of 1965 the collectibility of all accounts receivable was estimated by the Thor personnel most familiar with each account and their estimates were reviewed by three levels of management. All intercompany accounts were treated as fully collectible. A 100 percent reserve was established for the two Rubber Division accounts determined to be wholly uncollectible, and a one percent reserve was established for the remaining receivables in that division. The credit clerks in the Tool Division evaluated each 90-day-old account of over $100, and made an individual determination as to its collectibility. Again a 100 percent reserve was set aside for those accounts which were considered wholly uncollectible. The dollar ratio of uncollectible accounts to total over-$100 accounts was then applied to the 90-day-old accounts with a balance of under $100, to determine the dollar reserve to be set aside on these smaller accounts. Flat two percent reserves were set aside for all other 90-day-old accounts and all accounts between 30 and 90 days past due. A one percent reserve was established for all accounts less than 30 days old.

These computations resulted in a total addition to the bad debt reserve, i. e., a total deduction from income, of $135,150. The Commissioner, however, recomputed what he considered to be "a reasonable addition" to the reserve, by applying the six-year moving average, or Black Motor formula to the 1965 accounts receivable.[19] He divided the total of accounts written off by Thor during the tax year in question and the five preceding years by the total of year-end receivables for all six years. The resulting percentage was then applied to the 1965 year-end receivables, and the $74,790.80 by which Thor's claimed deduction exceeded the product of this calculation was disallowed.

Reasonable additions to a reserve for bad debts may be deducted pursuant to § 166(c) of the Internal Revenue Code of 1954.[20] As the Code makes clear, the Commissioner is to exercise his discretion regarding the reasonableness of any particular addition. In order to overturn the Commissioner's disallowance, therefore, the taxpayer must show that the Commissioner has abused his discretion. *Calavo, Inc. v. Commissioner*, 304 F.2d 650, 653–654 (9th Cir. 1962). This is a "heavy burden." *Consolidated-Hammer Dry Plate & Film Co. v. Commissioner*, 317 F.2d 829, 834 (7th Cir. 1963). As we have stated before, the issue thus presented "is whether the Commissioner's view is reasonable." *The First National Bank of Chicago v. Commissioner*, 546 F.2d 759, 761 (7th Cir. 1976), *cert. denied*, 431 U.S. 915, 97 S.Ct. 2176, 53 L.Ed.2d 225 (1977); *S. W. Coe & Co. v. Dallman*, 216 F.2d 566, 569 (7th Cir. 1954). If it is, the inquiry is ended. We agree with the Tax Court that the Commissioner's method of determining the reserve for bad debts, which gave preference to experience over estimates, was reasonable.

AFFIRMED.

---

18. Compare, as to obsolete goods, *C–O–Two Fire Equipment Co. v. Commissioner*, 219 F.2d 57 (3d Cir. 1955). The distinction is understandable in light of the fact that the regulations specifically allow deductions for obsolete property. See *United States Cartridge Co. v. United States*, 284 U.S. 511, 516–520, 52 S.Ct. 243, 76 L.Ed. 431 (1932).

19. The procedure is described in *Black Motor Co.*, 14 B.T.A. 300 (1940), *aff'd on other grounds*, 125 F.2d 977 (6th Cir. 1942).

20. 26 U.S.C. § 166(c) provides:
 "*Reserve for Bad Debts.*—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts."