THE WILL-BURT COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Will-Burt Co. v. Commissioner
Docket No. 1989-76.
United States Tax Court
T.C. Memo 1979-211; 1979 Tax Ct. Memo LEXIS 308; 38 T.C.M. (CCH) 861; T.C.M. (RIA) 79211; May 29, 1979, Filed Charles J. Tyburski, for the petitioner. Robert N. Armen, Jr., for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioner's income tax of $29,858.70 for 1971 and $1,941.35 for 1972. Due to concessions by petitioner, the sole issue for decision is whether respondent abused his discretion in determining that petitioner's write down of "excess" inventory of coal stoker parts did not conform to the regulations mulgated pursuant to section 471. [1] Specifically, we must decide whether petitioner's write down of its inventory (a) conformed to the *309 best accounting practice in its trade or business and (b) clearly reflected petitioner's income. FINDINGS OF FACT Most of the facts have been stipulated by the parties and are found accordingly. Petitioner was incorporated under the laws of the State of Ohio. At the time it filed its petition, its principal office was located in Orrville, Ohio. For more than 40 years petitioner has been engaged in the manufacture and sale of heating equipment, including coal stokers and stoker parts for domestic, commercial and industrial use. Petitioner manufactures primarily under-feed screw-type stokers, which take coal from a coal bin and move the coal through a screwtype conveyor directly into the furnace. Prior to 1973, the coal stoker industry was a dying one. This decline was caused by the conversion to oil and gas heating in both residential and commercial buildings. On an industry-wide basis, sales of mechanical coal stokers declined from $11,482,000 in 1961 to $791,000 in 1972. Units sold throughout the entire industry declined from in excess of 13,000 in *310 1960 to only 306 in 1972. Petitioner was not immune from this decline. Its sales of stokers declined from $377,760 in 1968 to $76,542 in 1972. In addition to selling coal stokers, petitioner also sold replacement parts for coal stokers. Its sales of stoker parts experienced the same decline as its sales of stokers--from $697,818 in 1967 to $296,638 in 1972. [2]
Petitioner was aware in the 1960s that the coal stoker business was dying, and it began to plan to diversify. Simultaneously, in order to stimulate its business temporarily, petitioner acquired most of the other companies in the underfeed screw-type coal stoker business. Petitioner took this action in spite of its pessimistic view of the future of the coal stoker industry, because it felt this action would allow it to "tread water or bide time" until it could diversify into other *311 fields. In 1961 petitioner acquired the stoker and stoker parts business of Illinois Iron and Bolt Company; in 1966, petitioner acquired the Iron Fireman line of stokers and parts from Space Conditioning, Inc:, and in 1967 petitioner acquired the Anchor Stoker division of a third competitor. By 1971, the first year in issue, petitioner controlled 90 percent of the under-feed screw-type coal stoker business in the United States. [3] In acquiring these businesses, it was not petitioner's primary intention to continue to manufacture the various brands of stokers. Instead, petitioner intended to supply customers with replacement parts, either from the inventories of parts acquired or by manufacturing parts using dies and patterns acquired, or by purchasing parts from third parties. Petitioner uses the accrual method of accounting and operates on a calendar-year basis. It determines its inventory by maintaining perpetual inventory records. These records are adjusted annually after a physical count of inventory. During the *312 years in issue, petitioner valued its inventory by means of the FIFO, lower of cost or market method. As petitioner acquired other coal stoker manufacturers, it added the parts acquired to its inventory, so that by 1971 petitioner had an inventory of replacement parts for its own stokers as well as those which had previously been manufactured by the acquired companies. [4]
Beginning in 1964, petitioner adopted the policy of writing down its inventory of stoker replacement parts at the end of the calendar year for purposes of determining ending inventory. This policy related only to replacement parts for stokers which were no longer being manufactured, including *313 parts acquired from other manufacturers. Although petitioner no longer manufactured some lines of stokers (including the lines acquired in the 1960s), there was continuing demand for replacement parts for older models; some stokers remain in use in excess of 30 years. In implementing its write-down policy, petitioner kept on its books an inventory of stoker replacement parts which was determined using a formula based on historical sales experience. The period used in the formula was determined by petitioner's management. From 1964 through 1966, petitioner retained in inventory a quantity of stoker parts sold in the prior three years. Stoker replacement parts in excess of such number were written off by petitioner. In 1967 the sales experience period used in the write-down formula was 2 1/2 years, and from 1968 through 1973 it was two years. Since petitioner's sales of replacement parts were rapidly declining through this period, petitioner was continually writing off its inventory. [5]
*314 However, petitioner did not scrap the "excess" replacement parts which were written off. Rather, after being written off and deleted from the perpetual inventory records, these parts were marked with red tags or otherwise identified. Petitioner had excess storage space during these years, and the red-tagged parts were segregated and placed there. When and if an order or request to purchase any "excess"part which had been written off and red-tagged was received, the written-off replacement part was restored to inventory and added to the perpetual inventory records at zero basis. [6] When the part which had been restored to inventory was sold, the profit equaled 100 percent of the selling price. With a few minor exceptions, petitioner never scrapped any of its "excess"inventory. Petitioner never made any effort to reduce its inventory of replacement parts by price *315 reductions or other sales techniques. These "excess" parts were not in any way defective, imperfect or different from the same type of stoker part maintained in inventory. The "excess" parts were not obsolete, since they could be used to repair coal stokers then in use. The "excess" parts were salable, and when they were restored to inventory they were sold for full price. When petitioner wrote off the "excess"parts, it knew that a portion of these parts would eventually be restored to inventory and sold. Petitioner did not know, however, which parts would eventually be restored to inventory and sold. Of the 1,177 items written off by petitioner in 1972, over one-quarter (291) had been restored to inventory by August 20, 1975. This method of writing down "excess" inventory was consistently followed by petitioner. Petitioner's independent auditor, as well as an independent expert witness, both were of the opinion that petitioner's write down of inventory conformed to generally accepted accounting principles and was consistent with best accounting practices in the coal stoker business. In 1971 petitioner reduced its ending inventory of coal stoker parts for that year by $51,915.28, *316 and in 1972 petitioner reduced its ending inventory of coal stoker parts for 1972 by $46,849.96. In his statutory notice of deficiency, respondent determined that petitioner's write down of "excess" inventory in 1971 and 1972 did not conform to the regulations promulgated pursuant to section 471. OPINION The sole issue for decision is whether respondent abused his discretion in determining that petitioner's write down of "excess" inventory of coal stoker parts did not conform to the regulations promulgated pursuant to section 471. Respondent contends that petitioner's write down of "excess" inventory in 1971 and 1972 did not conform to section 1.471-2, Income Tax Regs., in that it was not the best accounting practice and did not clearly reflect income. Petitioner, on the other hand, contends that this write down of inventory conformed with generally accepted accounting principles and was necessary to properly reflect its income in a dying industry. We agree with respondent. Inventory accounting is governed by section 1.471, Income Tax Regs.[7] Subsection 1.471-2(a), Income Tax Regs., provides two tests to which a method of inventory accounting must conform: *317 (1) It must conform as nearly as may be to the best accounting practice in the trade or business, and (2) It must clearly reflect the income. This regulation, along with sections 446 and 471, vests in respondent wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income. Thor Power Tool Co. v. Commissioner,439 U.S.    ,     (1979), affg. 64 T.C. 154 (1975), affd. 563 F. 2d 861 (7th Cir. 1977) [hereinafter Thor]. This case is indistinguishable from Thor. In Thor the taxpayer manufactured hand-held power tools; it maintained an inventory of replacement parts. After new management took over Thor, it wrote down its "excess" inventory of parts, which were parts in excess of reasonably foreseeable future demand. Thor used a formula under which the quantity of parts in excess of two years' estimated demand was written off entirely, and the quantity of each part corresponding to from one to two years' estimated demand was written down by 50 percent to 75 percent. Thor also used flat percentage write downs where it could not forecast future sales. *318 Respondent disallowed Thor's write down of its excess inventory. We held that Thor's write down of its inventory was within the term "best accounting practice" as used in section 1.471-2(a), Income Tax Regs., but nevertheless sustained respondent's determination that the method did not clearly reflect income. The basis for our holding was that Thor's replacement parts were normal, salable goods and had to be valued at the lower of cost or market. 64 T.C. at 165, 166-75. The Court of Appeals for the Seventh Circuit affirmed our decision, and certiorari was granted. In its recent decision, the Supreme Court also affirmed the holding of this Court. For purposes of this case, the critical portion of the Supreme Court's opinion in Thor is its interpretation of the "lower of cost or market" method of inventory accounting, which petitioner used. This method of accounting is governed by sections 1.471-2(c) and 1.471-4, Income Tax Regs., which are set forth in the margin. [8]
*319 The Supreme Court succinctly stated its conclusion: From this language, the regulatory scheme is clear. The taxpayer must value inventory for tax purposes at cost unless the "market" is lower. "Market" is defined as "replacement cost," and the taxpayer is permitted to depart from replacement cost only in specified situations. When it makes any such departure, the taxpayer must substantiate its lower inventory valuation by providing evidence of actual offering, actual sales, or actual contract cancellations. In the absence of objective evidence of this kind, a taxpayer's assertions as to the "market value" of its inventory are not cognizable in computing its income tax. 439 U.S. at    . In sum, the Supreme Court held that in order to clearly reflect income, a method of inventory accounting based on the lower of cost or market method cannot account separately for "excess" inventory so long as such "excess" inventory is comprised of normal, salable goods. In order to reduce the value of its inventory, a taxpayer must prove that the goods are damaged, imperfect, out of style, etc., or the taxpayer must offer the goods for sale at a lower price. As the Supreme Court *320 stated, the taxpayer must present "hard evidence" to enable it to write down its inventory. 439 U.S. at    . This holding of the Supreme Court in Thor is applicable here. As in Thor, there is no proof in this case that petitioner's "excess" inventory was unsalable at normal prices because of damage, imperfections, etc. 439 U.S. at    ; section 1.471-2(c), Income Tax Regs. In fact, the parts which petitioner red-tagged and segregated were not in any way different from the parts which remained in inventory, and they were sold at full price if and when the "excess" parts were restored to inventory. In short, petitioner has not presented the "hard evidence" which the regulatory scheme mandates as a precondition to writing down inventory. Although petitioner was in a dying business, in order to write down its inventory it had to scrap the unneeded replacement parts. Petitioner's course of action--red-tagging and segregating parts deemed "excess"--is accorded no heed in the regulatory framework. Petitioner's contentions in this case were all rejected by the Supreme Court. [9] Petitioner contends, first and foremost, that because its method of inventory accounting *321 was the best method and was consistently applied, it is entitled to the presumption that this method clearly reflected its income. The Supreme Court specifically rejected the notion that any such "presumption" exists. 439 U.S. at    . [10] Petitioner also relies on a distinction between its case and the decision of the Seventh Circuit. The Seventh Circuit emphasized that Thor was not entitled to a "presumption" that its method of accounting clearly reflected income since the method was not consistently applied; petitioner, on the other hand, contends that it has consistently written down its inventory by this method. 563 F. 2d at 868-69. This argument, however, is of no avail, since the Supreme Court did not consider this a relevant factor. Rather, the Supreme Court emphasized that the pivotal factor in inventory accounting is respondent's determination that the method of accounting clearly reflects income within the meaning of section 471 and section 1.471-2, Income Tax Regs.
*322 Like Thor, petitioner contends that respondent's position puts it in a dilemma--it must choose between scrapping replacement parts it does not foresee using, or keeping them in inventory. This problem was also addressed by the Supreme Court: If this is indeed the dilemma that confronts Thor, it is in reality the same choice that every taxpayer who has a paper loss must face. It can realize its loss now and garner its tax benefit, or it can defer realization, and its deduction, hoping for better luck later. Thor, quite simply, has suffered no present loss. It deliberately manufactured its "excess" spare parts because it judged that the marginal cost of unsalable inventory would be lower than the cost of retooling machinery should demand surpass expectations. This was a rational business judgment and, not unpredictably, Thor now has inventory it believes it cannot sell. Thor, of course, is not so confident of its prediction as to be willing to scrap the "excess" parts now; it wants to keep them on hand, just in case. This, too, is a rational judgment, but there is no reason why the Treasury should subsidize Thor's hedging of its bets. There is also no reason why Thor should *323 be entitled, for tax purposes, to have its cake and to eat it, too.
For the reasons set forth by the Supreme Court in its recent decision in Thor, we hold that respondent did not abuse his discretion in determining that petitioner's write down of its "excess" stoker parts inventory did not clearly reflect income. Accordingly, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. After the Arab Oil Embargo of 1973, the coal stoker business improved. Industry-wide, sales of stokers increased from $791,000 in 1972 to $8,345,000 in 1976, and petitioner's sales of stokers increased from $76,542 in 1972 to $780,894 in 1977. Petitioner's sales of stoker parts also increased from $296,638 in 1972 to $591,855 in 1977.↩
3. Other types of stokers, particularly traveling grates and conveyors used by large utilities and ram feed stokers, were not manufactured by petitioner.↩
4. On its books and records, petitioner showed only the acquired inventory which it had paid for. For example, the quantity of replacement parts in excess of a six-year supply (as defined in the contract) which petitioner obtained from Illinois Iron and Bolt were transferred without cost, and the quantity in excess of a three year supply (as defined in the contract) which petitioner obtained from Space Conditioning, Inc., were transferred without cost. These parts were not included in inventory since they had no cost.↩
5. Petitioner's write offs of parts were as follows: ↩ Year
Write-Offs
1964
$22,429.53
1965
6,686.90
1966
0.00
1967
87,362.51
1968
75,978.84
1969
0.00
1970
70,480.00
1971
51,915.28
1972
46,849.59
1973
0.00
1974
0.00
1975
0.00
1976
0.00
6. Petitioner restored its "excess" parts to its inventory as follows: ↩ Year
Restored
1964 $ 0.00
1965
0.00
1966
7,266.71
1967
20,329.13
1968
38,781.29
1969
19,697.29
1970
26,192.48
1971
16,389.47
1972
11,100.96
1973
27,161.76
1974
24,149.57
1975
23,160.04
1976
9,109.20
7. Petitioner does not challenge the validity of these regulations. See Thor Power Tool Co. v. Commissioner,↩ 439 U.S.    ,     (1979).
8. Section 1.471-2(c) provides: (c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. (For inventories by dealers in securities, see § 1.471-5.) Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable bass, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made. Section 1.471-4 provides: (a) Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases-- (1) Of goods purchased and on hand, and (2) Of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i.e., those not legally subject to cancellation by either party) at fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost. (b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market. (c) Where the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article.↩
9. We note that petitioner's briefs in this case were filed before the Supreme Court's decision in Thor↩ was announced. 10. Because we decide that respondent did not abuse his discretion in determining that petitioner's method of accounting did not clearly reflect income, we need not decide whether this was the best accounting practice in petitioner's trade or business. We note, however, that petitioner presented the uncontradicted testimony of two experts to that effect; this testimony was forthright, credible and persuasive.↩