BRUSH WELLMAN, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12978–78.     Filed July 28, 1982.

---

*Charles J. Kerester* and *Wallace M. Wright*, for the petitioner.

*Thomas J. Stalzer*, for the respondent.

Nims, *Judge*: Respondent determined a $651,156 deficiency in petitioner's income tax for the tax year 1972. Petitioner claims an overpayment of 1972 income tax in the amount of $4,032.

Due to concessions by the petitioner, the only issue remaining for decision is whether petitioner's use of the practical capacity concept in costing its goods for 1975 conformed with the requirements of section 1.471–11(d)(4), Income Tax Regs. Resolution of this issue determines if petitioner incurred a net operating loss in 1975 and is entitled to a carryback deduction for the year 1972.

### FINDINGS OF FACT

Some of the facts of this case are stipulated. The stipulation and attached exhibits are incorporated herein by reference.

Petitioner, an Ohio corporation, maintained its principal office in Cleveland, Ohio, when it filed the petition in this case.

Petitioner, at all relevant times, was an accrual basis taxpayer.

Petitioner is a fully integrated miner-manufacturer of products containing beryllium. From its founding in 1931, petitioner has been an engineering and manufacturing company which developed new materials, new processes, and new commercial applications for beryllium and its alloys. During the 1960's and 1970's, petitioner's products fell into three distinct groups: beryllium metal; beryllium alloys; and beryllium oxides. Each product group utilized separate manufacturing processes and served different markets. Metallic beryllium products primarily served U.S. defense projects. Beryllium alloy and oxide products primarily served private commercial customers.

Petitioner had a large investment in facilities because it was a fully integrated producer in a capital intensive industry. Petitioner's financial and cost accounting system utilized 28 cost centers, each of which reflected major production depart-

ments. Petitioner operated a mine and ore extraction facility in Utah to supply ore concentrate to the three product lines. Petitioner designated the Utah facility as "cost center 8000." Prior to 1977, petitioner also operated an ore extraction facility in Elmore, Ohio. This facility, designated "cost center 6111," was designed to process imported ore.

Petitioner's manufacturing operations were located in Elmore, Ohio. The cost centers associated with the metallic beryllium product line were:

| Cost center | Production department |
|---|---|
| 6114 | Pebbles |
| 6121 | Vacuum castings |
| 6123 | Attrition |
| 6124 | Fine powder |
| 6162 | Hot press |
| 6165 | Machining |
| 6166 | Sheet |
| 6167–9 | Inspection and X-ray |
| 6168 | Cold press |

The cost centers associated with the beryllium alloys product line were:

| Cost center | Production department |
|---|---|
| 7200 | Reduction furnace |
| 7210 | Melting and casting |
| 7212 | Sand casting |
| 7213 | Billet preparation |
| 7221 | Rodmill |
| 7222 | Coil buildup |
| 7224 | Slab milling |
| 7225 | 4–Hi rolling |
| 7226 | Strand pickle |
| 7227 | Roller hearth |
| 7228 | Breakdown rolling |
| 7229 | General mill |
| 7230–1 | Inspection |
| 7270 | Extrusion |
| 74XX | Reading alloy |

The cost centers associated with the beryllium oxide product line were:

| Cost center | Production department |
|---|---|
| 6113 | Oxide |
| 613X | Ceramics |

Periodic booms and busts characterized the demand for petitioner's products. These market forces affected petitioner's level of production. Petitioner's facilities were designed specially for beryllium products. Thus, it could not manufacture alternative products when demand for beryllium decreased. Therefore, petitioner produced less in times of slack demand than in times of high demand. Also, the fully integrated nature of petitioner's operation meant that decreases in demand for a product resulted in less utilization of petitioner's facilities at each stage of the production line, from mining through manufacturing.

Petitioner used the standard cost method for allocating inventoriable costs for financial and tax accounting. As part of its cost accounting system, petitioner used a concept, which it termed "practical capacity," to allocate fixed indirect costs between inventoriable costs and period costs to account for unused capacity. Under its approach, petitioner, prior to a production year, determined a production level for each cost center. This level was the production department's "practical capacity." If production for the year was less than the practical capacity level, then petitioner immediately deducted the proportionate amount of costs allocable to unused capacity. For example, if a cost center had a practical capacity of 100 units per year; the fixed indirect cost of the cost center was $100 per year; and the actual production level for the year was 85 units, then $85 would be allocated to inventoriable costs to be deducted in the year the goods were sold, and the $15 allocable to unused capacity would be deducted in the year of production.

Petitioner carefully set the practical capacity level for each cost center. First, based on engineering studies, petitioner determined the theoretical capacity for the cost center: the level of production which could be attained if the department operated continuously at peak efficiency. Second, petitioner determined the downtime realistically expected due to normal work stoppages arising from the production process, itself, such as machine breakdown. Thus, petitioner reduced theoretical capacity to the maximum production level which, practi-

cally speaking, the cost center *alone* could be expected to maintain.

Third, petitioner determined the constraints imposed on a cost center's capacity to produce due to production bottlenecks upstream or downstream in the production process. This step was important because of the fully integrated nature of petitioner's operation. The key working material for each cost center came from another of petitioner's production departments. Thus, if cost center X practically could produce 150 units per year if it received 150 units of working material per year, then cost center X's capacity would be less than 150 units per year if it received only 110 units of working material from its feeder department, petitioner's cost center Y. Therefore, petitioner reduced the production level determined in the second step to the maximum production level which, practically speaking, the cost center, when considered as part of an integrated process, could be expected to maintain.

These three steps described the process through which petitioner determined the practical capacity of a production department which just came on line or which just experienced an investment or disinvestment which affected its physical capacity to produce. Petitioner also reexamined the practical capacity levels each year to determine if experience proved that the prior estimate of the cost center's practical physical ability to produce was too high or too low. Adjustments were made as necessary to incorporate the results of practical experience.

In short, petitioner's practical capacity determination involved an analysis of all factors relevant to estimating its ability to produce. Petitioner did *not* incorporate market demand in this analysis. Petitioner's practical capacity determination, therefore, reflected its estimated capacity to produce goods rather than its anticipated ability to sell goods.

Petitioner's practical capacity determinations for each of its 28 cost centers obviously was a complex undertaking. After a careful review of the record, we find that petitioner in fact applied the process just described in setting its practical capacity levels for each department for 1975.

We note that certain production departments were designed to operate 24 hours a day, 7 days a week. For example, cost center 6114, the production department termed "Pebbles,"

converted beryllium hydroxide into a crude metallic form of beryllium. The process involved the production of beryllium fluoride and the reduction thereof with magnesium. The process is corrosive. It is performed in furnaces which operate at high temperatures. The furnaces require a 4-hour heat-up and a 4-hour cool-down period. Therefore, continuous operation is the most efficient mode of operation. Also, some of the upstream processing departments are the bottlenecks in petitioner's integrated production lines. Some of these upstream departments must be operated on a 24-hour day, 7-day week basis to provide adequate material for the downstream departments to operate efficiently. As a result of these factors, petitioner's practical capacity calculation for some departments was based on an assumption of continuous operation.

Other departments, however, were designed to operate on a one or two shifts per day basis. These departments generally were the downstream fabrication departments. Accordingly, petitioner's practical capacity determination for these cost centers was based on an assumption of noncontinuous operation. In general, therefore, petitioner's designation of practical capacity levels represented its best estimate of each department's capacity to produce based on a balanced, system-wide analysis.

Petitioner started using its practical capacity method in 1964 following disputes with the General Accounting Office concerning petitioner's pricing under certain Government contracts. These disputes were resolved against petitioner because of petitioner's inability to justify its position. The practical capacity method was installed to accurately determine the cost of idle or excess capacity. Petitioner's method has been used consistently since 1964 for both financial and tax accounting.

The issue in this case concerns petitioner's 1975 determinations of practical capacity. The 1975 practical capacity levels and the 1975 actual production levels for each cost center were as shown in table 1 on page 166.

These figures indicate that petitioner's 1975 production levels were significantly less than its capacity to produce in that year. 1975 was a bad year for petitioner. Sales of petitioner's beryllium products slumped more than 40 percent that year to \$28,910,334 from \$50,408,783 in 1974 and

TABLE 1

| Cost center | Units of measure | 1975 Practical capacity | 1975 Actual production |
|---|---|---|---|
| Extraction departments | | | |
| 8000 | Lbs. Be[1] | 305,000 | 138,983 |
| 6111 | Lbs. Be | 400,000 | 146,465 |
| Metal departments | | | |
| 6114 | Lbs. Be | 235,000 | 61,680 |
| 6121 | Lbs. Be | 500,000 | 62,581 |
| 6123 | Lbs. Be | 450,000 | 57,504 |
| 6124 | Lbs. Be | 30,000 | 10,032 |
| 6162 | Furnace hrs. | 25,000 | 6,754 |
| 6165 | Labor hrs. | 60,000 | 33,906 |
| 6166 | Labor hrs. | 10,000 | 2,787 |
| 6167–9 | Labor hrs. | 16,000 | 8,543 |
| 6168 | Labor hrs. | 12,000 | 5,721 |
| Alloy departments | | | |
| 7200 | Labor hrs. | 22,000 | 5,152 |
| 7210 | Furnace hrs. | 12,000 | 4,192 |
| 7212 | Labor hrs. | 5,900 | 6,108 |
| 7213 | Labor hrs. | 10,000 | 6,167 |
| 7221 | Labor hrs. | 15,000 | 8,513 |
| 7222 | Labor hrs. | 3,400 | 1,323 |
| 7224 | Labor hrs. | 3,800 | 938 |
| 7225 | Labor hrs. | 4,000 | 1,156 |
| 7226 | Labor hrs. | 3,000 | 1,311 |
| 7227 | Labor hrs. | 12,000 | 3,212 |
| 7228 | Labor hrs. | 4,000 | 1,368 |
| 7229 | Labor hrs. | 10,000 | 5,236 |
| 7230–1 | Labor hrs. | 15,000 | 11,573 |
| 7270 | Machine hrs. | 1,300 | 687 |
| 74XX | Labor hrs. | 100,000 | 40,945 |
| Oxide departments | | | |
| 6113 | Lbs. Be | 25,000 | 10,458 |
| 613X | Labor hrs. | 69,000 | 48,068 |

[1] Be is the symbol for the element beryllium.

$51,366,191 in 1973. Demand was down for all three product lines.

The metals departments, which were associated with defense contracts, experienced a boom during the 1960's when petitioner made parts for the C–5A aircraft and inertial guidance systems for various missile systems, among other projects. In order to meet this demand, and in expectation of continued high demand, petitioner made substantial investments to expand its capacity to produce. For example, in 1967, petitioner developed a process and built the Utah extraction facility to ensure a domestic supply of beryllium. Previously, all beryllium ore had been imported.

The defense-related business peaked in the late 1960's and early 1970's. Petitioner's beryllium metal sales exceeded $20 million in 1971. Subsequently, anticipated contract renewals and new projects did not occur. Some contracts were canceled. Consequently, a precipitous decline in beryllium metal sales occurred, approximately as follows:

| Year | Sales volume |
|------|------|
| 1972 | $18 million |
| 1973 | 13 million |
| 1974 | 7 to 8 million |
| 1975 | 5 to 6 million |

Due to this drop in metal sales, petitioner's metal departments were significantly underutilized during the mid–1970's. Demand for beryllium metal products increased in the late 1970's. But sales of beryllium metal products did not exceed the 1971 dollar level until 1980. Sales measured in units of beryllium metal did not exceed the 1971 level even in 1980.

Despite the decline in the beryllium metal business, petitioner maintained a reasonable aggregate level of sales in 1973–74 because of the strength of its alloys and oxides business. The alloy and oxide products served the private, commercial market. By 1975, however, the economic recession following the Arab oil embargo hurt demand for petitioner's alloy and oxide products.

As demand for petitioner's products decreased, petitioner attempted to reduce its inventories. The absence of sales and the inventory reduction process affected petitioner's employment and production levels and, thus, its utilization of facilities. Petitioner initiated a layoff program and reduced its

production schedules in 1975. Petitioner furloughed employees by having people work 2 or 3 weeks and then taking a week off. These layoffs affected employees with as much as 10-years seniority.

Petitioner's technique for reducing plant utilization depended on the type of production process involved. Departments designed to operate continuously were shut down for extended periods. When reopened, these departments operated continuously again until the next shutdown. Shutdowns were extended several weeks in some cases.

For departments not designed for continuous operation, petitioner utilized a "campaign" operation. Under this approach, petitioner used crews, which had been reduced in size by furloughs, to operate only one part of a production process until it could no longer stockpile the output. Then, the crew moved to the next production step to process the output in a similar manner. In this way, some parts of the production process were used while other stages were idle.

Petitioner's practical capacity determinations and actual production levels for the years 1968–75 were as shown in table 2 on pages 170–173.

Petitioner deducted $16,502,939 in 1975 as the cost of goods sold. Included in this amount was a deduction of $8,600,983 for idle capacity which was associated with petitioner's practical capacity method. Respondent determined that $7,236,007 of this claimed deduction related to idle capacity and properly was deductible in 1975. But respondent disallowed a deduction for the $1,364,976 remainder "because it has not been established that any amount in excess of $7,236,007 represents a current business deduction within the meaning of Code sections 471 and 162."

OPINION

The question in this case concerns petitioner's use of its practical capacity method in determining the amount of the deduction to which it is entitled for idle capacity. Generally, all manufacturing costs are "inventoriable costs." That is, the costs of producing goods must be allocated to the goods produced during the year. The manufacturer gets a deduction for the costs of producing the goods only when the goods are sold. Sec. 1.471–11, Income Tax Regs. (the so-called "full

absorption" regulations). Section 1.471–11(d)(4), Income Tax Regs. (hereinafter referred to as the practical capacity regulation), however, provides an exception to the rule of full absorption for fixed indirect production costs.[1] This section provides:

(4) *Practical capacity concept* —(i) *In general.* Under the practical capacity concept, the percentage of practical capacity represented by actual production (not greater than 100 percent), as calculated under subdivision (ii) of this subparagraph, is used to determine the total amount of fixed indirect production costs which must be included in the taxpayer's computation of the amount of inventoriable costs. The portion of such costs to be included in the taxpayer's computation of the amount of inventoriable costs is then combined with variable indirect production costs and both are allocated to the goods in ending inventory in accordance with this paragraph. See the example in subdivision (ii)(*d*) of this subparagraph. The difference (if any) between the amount of all fixed indirect production costs and the fixed indirect production costs which are included in the computation of the amount of inventoriable costs under the practical capacity concept is allowable as a deduction for the taxable year in which such difference occurs.

(ii) *Calculation of practical capacity—(a) In general.* Practical capacity and theoretical capacity (as described in *(c)* of this subdivision) may be computed in terms of tons, pounds, yards, labor hours, machine hours, or any other unit of production appropriate to the cost accounting system used by a particular taxpayer. The determination of practical capacity and theoretical capacity should be modified from time to time to reflect a change in underlying facts and conditions such as increased output due to automation or other changes in plant operation. Such a change does not constitute a change in method of accounting under sections 446 and 481.

*(b) Based upon taxpayer's experience.* In selecting an appropriate level of production activity upon which to base the calculation of practical capacity, the taxpayer shall establish the production operating conditions expected during the period for which the costs are being determined, assuming that the utilization of production facilities during operations will be approximately at capacity. This level of production activity is frequently described as practical capacity for the period and is ordinarily based upon the historical experience of the taxpayer. For example, a taxpayer operating on a 5-day, 8-hour basis may have a "normal" production of 100,000 units a year based upon three years of experience.

*(c) Based upon theoretical capacity.* Practical capacity may also be established by the use of "theoretical" capacity, adjusted for allowances for estimated inability to achieve maximum production, such as machine breakdown, idle time, and other normal work stoppages. Theoretical

---

[1]The regulations also provide an exception for certain indirect production costs. Sec. 1.471–11(c), Income Tax Regs.

TABLE 2

| Cost center | Units of measure | 1968 P/C¹ | 1968 A/P | 1969 P/C | 1969 A/P | 1970 P/C | 1970 A/P | 1971 P/C | 1971 A/P |
|---|---|---|---|---|---|---|---|---|---|
| **Extraction departments** | | | | | | | | | |
| 8000 | Lbs. Be | (²) | --- | --- | 46,530 | 264,000 | 260,657 | 308,000 | 305,605 |
| 6111 | Lbs. Be | 300,000 | 432,823 | 420,000 | 355,203 | 400,000 | 194,640 | 400,000 | 214,135 |
| **Metal departments** | | | | | | | | | |
| 6114 | Lbs. Be | 195,000 | 212,667 | 220,000 | 200,680 | 220,000 | 183,651 | 220,000 | 248,203 |
| 6121 | Lbs. Be | 290,000 | 378,061 | 385,000 | 419,425 | 410,000 | 447,580 | 460,000 | 655,673 |
| 6123 | Lbs. Be | 245,000 | 346,813 | 360,000 | 374,692 | 360,000 | 439,676 | 450,000 | 636,268 |
| 6124 | Lbs. Be | 12,600 | 3,597 | 12,600 | 17,600 | 12,600 | 4,919 | 12,600 | 2,123 |
| 6162 | Furnace hrs. | 27,500 | 32,195 | 32,500 | 31,115 | 32,500 | 35,390 | 35,000 | 43,117 |
| 6165 | Labor hrs. | 14,000 | 23,104 | 23,000 | 24,115 | 23,000 | 25,608 | 24,700 | 46,706 |
| 6166 | Labor hrs. | 12,000 | 9,468 | 12,000 | 9,392 | 12,000 | 3,213 | 12,000 | 2,886 |
| 6167–9 | Labor hrs. | 8,000 | 7,218 | 8,000 | 7,611 | 8,000 | 5,998 | 8,000 | 6,667 |
| 6168 | Labor hrs. | 8,000 | 884 | 8,000 | 404 | 6,000 | 112 | 6,000 | 2,405 |
| **Alloy departments** | | | | | | | | | |
| 7200 | Labor hrs. | --- | --- | --- | --- | --- | --- | 23,200 | 15,455 |
| 7210 | Furnace hrs. | 66,800 | 74,928 | 72,000 | 71,486 | 72,000 | 57,861 | 9,500 | 6,739 |
| 7212 | Labor hrs. | --- | --- | --- | --- | --- | --- | --- | --- |

| | | | | | | | | | |
|---|---|---:|---:|---:|---:|---:|---:|---:|---:|
| 7213 | Labor hrs. | -- | -- | -- | -- | -- | -- | 10,800 | 7,524 |
| 7221 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7223 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7222 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7224 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7225 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7226 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7227 | Labor hrs. | 51,950 | 55,738 | 55,500 | 57,221 | -- | -- | -- | -- |
| 7220 | Labor hrs. | -- | -- | -- | -- | 55,500 | 50,921 | 55,500 | 40,180 |
| 7228 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7229 | Labor hrs. | -- | -- | -- | -- | -- | -- | -- | -- |
| 7230-1 | Labor hrs. | 6,450 | 5,465 | 15,500 | 13,502 | 15,500 | 10,844 | 15,500 | 13,593 |
| 7270 | Machine hrs. | -- | -- | 955 | 519 | 955 | 356 | 940 | 637 |
| 74XX | Labor hrs. | 65,000 | 62,108 | 65,000 | 69,898 | 68,965 | 65,232 | 80,000 | 63,013 |
| Oxide departments | | | | | | | | | |
| 6113 | Lbs. Be | 15,000 | 22,639 | 23,000 | 17,524 | 23,000 | 20,501 | 23,000 | 20,560 |
| 613X | Labor hrs. | 55,000 | 74,049 | 68,000 | 56,487 | 68,000 | 56,280 | 68,000 | 41,990 |

[1] P/C reflects practical capacity determinations. A/P reflects actual production levels.

[2] Blanks indicate that data is unavailable because cost center, as defined in 1975, was not yet existant or because a previously existant cost center no longer existed in 1975.

| Cost center | Units of measure | 1972 | | 1973 | | 1974 | | 1975 | |
|---|---|---|---|---|---|---|---|---|---|
| | | P/C | A/P | P/C | A/P | P/C | A/P | P/C | A/P |
| **Extraction departments** | | | | | | | | | |
| 8000 | Lbs. Be | 305,000 | 246,005 | 305,000 | 281,739 | 305,000 | 251,836 | 305,000 | 138,983 |
| 6111 | Lbs. Be | 400,000 | 178,035 | 400,000 | 284,666 | 400,000 | 337,731 | 400,000 | 146,465 |
| **Metal departments** | | | | | | | | | |
| 6114 | Lbs. Be | 235,000 | 165,191 | 235,000 | 193,025 | 235,000 | 153,789 | 235,000 | 61,680 |
| 6121 | Lbs. Be | 575,000 | 573,240 | 575,000 | 386,827 | 500,000 | 142,735 | 500,000 | 62,581 |
| 6123 | Lbs. Be | 550,000 | 553,473 | 550,000 | 356,720 | 450,000 | 127,625 | 450,000 | 57,504 |
| 6124 | Lbs. Be | 5,000 | 11,880 | 18,000 | 18,552 | 30,000 | 10,621 | 30,000 | 10,032 |
| 6162 | Furnace hrs. | 37,500 | 34,306 | 37,500 | 23,578 | 25,000 | 10,697 | 25,000 | 6,754 |
| 6165 | Labor hrs. | 43,000 | 30,645 | 30,000 | 25,533 | 60,000 | 45,710 | 60,000 | 33,906 |
| 6166 | Labor hrs. | 12,000 | 3,148 | 10,000 | 7,121 | 10,000 | 6,481 | 10,000 | 2,787 |
| 6167–9 | Labor hrs. | 7,000 | 5,123 | 7,000 | 5,630 | 18,000 | 12,169 | 16,000 | 8,543 |
| 6168 | Labor hrs. | 12,000 | 2,841 | 12,000 | 4,056 | 12,000 | 5,260 | 12,000 | 5,721 |
| **Alloy departments** | | | | | | | | | |
| 7200 | Labor hrs. | 20,000 | 25,356 | 18,000 | 22,323 | 22,000 | 21,710 | 22,000 | 5,152 |
| 7210 | Furnace hrs. | 8,000 | 9,743 | 9,000 | 12,897 | 12,000 | 12,845 | 12,000 | 4,192 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7212 | Labor hrs. | --- | --- | --- | --- | 5,900 | 8,017 | 5,900 | 6,108 |
| 7213 | Labor hrs. | 10,000 | 11,222 | 10,000 | 15,296 | 14,000 | 14,316 | 10,000 | 6,167 |
| 7221 | Labor hrs. | 12,900 | 12,525 | 12,900 | 17,195 | 15,000 | 15,877 | 15,000 | 8,513 |
| 7223 | Labor hrs. | 8,100 | 8,212 | 8,100 | 10,504 | 5,200 | 9,198 | --- | --- |
| 7222 | Labor hrs. | 3,400 | 3,331 | 3,400 | 4,080 | 3,400 | 4,344 | 3,400 | 1,323 |
| 7224 | Labor hrs. | 3,800 | 3,614 | 3,800 | 3,905 | 3,800 | 4,705 | 3,800 | 938 |
| 7225 | Labor hrs. | 2,800 | 2,941 | 2,800 | 3,724 | 3,400 | 3,832 | 4,000 | 1,156 |
| 7226 | Labor hrs. | 3,300 | 3,433 | 3,300 | 4,438 | 2,000 | 4,996 | 3,000 | 1,311 |
| 7227 | Labor hrs. | 9,200 | 10,121 | 9,200 | 12,779 | 7,700 | 12,058 | 12,000 | 3,212 |
| 7220 | Labor hrs. | --- | --- | --- | --- | --- | --- | --- | --- |
| 7228 | Labor hrs. | --- | --- | --- | --- | 1,800 | 957 | 4,000 | 1,368 |
| 7229 | Labor hrs. | 6,500 | 6,416 | 6,500 | 7,753 | 8,900 | 9,104 | 10,000 | 5,236 |
| 7230–1 | Labor hrs. | 15,000 | 11,150 | 15,000 | 14,842 | 15,000 | 14,674 | 15,000 | 11,573 |
| 7270 | Machine hrs. | 940 | 906 | 940 | 1,364 | 1,300 | 1,104 | 1,300 | 687 |
| 74XX | Labor hrs. | 75,000 | 77,028 | 75,000 | 92,324 | 90,000 | 109,166 | 100,000 | 40,945 |
| Oxide departments | | | | | | | | | |
| 6113 | Lbs. Be | 23,000 | 27,541 | 23,000 | 22,341 | 23,000 | 24,756 | 25,000 | 10,458 |
| 613X | Labor hrs. | 50,000 | 49,826 | 50,000 | 71,550 | 65,000 | 69,061 | 69,000 | 48,068 |

capacity is the level of production the manufacturer could reach if all machines and departments were operated continuously at peak efficiency.

*(d) Example.* The provisions of *(c)* of this subdivision may be illustrated by the following example:

Corporation X operates a stamping plant with a theoretical capacity of 50 units per hour. The plant actually operates 1960 hours per year based on an 8-hour day, 5-day week basis and 15 shutdown days for vacations and holidays. A reasonable allowance for down time (the time allowed for ordinary and necessary repairs and maintenance) is 5 percent of practical capacity before reduction for down time. Assuming no loss of production during starting up, closing down, or employee work breaks, under these facts and circumstances X may properly make a practical capacity computation as follows:

Practical capacity without allowance for down time
   based on theoretical capacity per hour is (1960 × 50) .................. 98,000
Reduction for down time (98,000 × 5%) .................................... 4,900
Practical capacity ........................................................ 93,100

The 93,100 unit level of activity (*i.e.*, practical capacity) would, therefore, constitute an appropriate base for calculating the amount of fixed indirect production costs to be included in the computation of the amount of inventoriable costs for the period under review. On this basis if only 76,000 units were produced for the period, the effect would be that approximately 81.6 percent (76,000, *the actual number of units produced, divided by 93,100, the maximum number of units producible at practical capacity*) of the fixed indirect production costs would be included in the computation of the amount of inventoriable costs during the year. The portion of the fixed indirect production costs not so included in the computation of the amount of inventoriable costs would be deductible in the year in which paid or incurred. Assume further that 7,600 units were on hand at the end of the taxable year and the 7,600 units were in the same proportion to the total units produced. Thus, 10 percent (7,600 units in inventory at the end of the taxable year, divided by 76,000, the actual number of units produced) of the fixed indirect production costs included in the computation of the amount of inventoriable costs (the above-mentioned 81.6 percent) and 10 percent of the variable indirect production costs would be included in the cost of the goods in the ending inventory, in accordance with a method of allocation provided by this paragraph.

Thus, the regulations allow an immediate deduction for the fixed indirect production costs associated with idle capacity; i.e., the costs associated with the difference between the practical capacity level and the actual production level.

Neither party argues that the regulation is invalid. The parties disagree solely on whether or not petitioner's practical

capacity determinations are consistent with the regulation's requirements.[2]

Petitioner argues that its approach satisfies the practical capacity regulation and that it thus is entitled to the full deduction it claimed on its return. Respondent argues that petitioner's approach is fatally defective because it failed to include anticipated market demand in its practical capacity computations. Respondent redetermined petitioner's practical capacity levels using a 3-year moving average. For example, respondent's practical capacity level for cost center 8000 for 1975 was 259,860 pounds Be, which is the average actual production of cost center 8000 for the period 1972–74. By comparison, petitioner's practical capacity determination for cost center 8000 for 1975 was 305,000 pounds Be. Cost center 8000's actual production for 1975 was 138,983 pounds Be. Using his method, respondent determined that petitioner was entitled to deduct only $7,236,007 of the $8,600,983 amount claimed as a deduction arising from idle capacity.

The burden of proof on disputed issues of fact is, of course, on petitioner. Rule 142(a).[3] In matters of inventory accounting, the taxpayer must carry the heavy burden of proving that

---

[2]Although the parties provided the Court with some discussion about generaly accepted accounting principles and clear reflection of income, there is no indication that either party argues that these principles have any significance in this case independent of their reflection in the requirements of the regulation. For example, respondent, in his brief, stated the issue this way: "Whether, under the provisions of Treas. Reg. § 1.471–11(d)(4), petitioner must adjust its levels of practical capacity, particularly those involved in its beryllium metal business, to reflect changes in plant operation (other than changes in physical facilities) which occurred prior to, and including, 1975." Accordingly, we do not have to decide in this case whether petitioner would have to prove that its practical capacity approach clearly reflected its income and that it was consistent with the best accounting practice in addition to showing that its approach satisfied the terms of the regulation. We note, however, that the respondent, in exercising his authority under sec. 471, apparently determined that if a taxpayer satisfied the requirements of the regulations then the taxpayer's income is deemed to be clearly reflected and consistent with the best accounting practice. See sec. 1.471–11(a), Income Tax Regs. Compare *Maple Leaf Farms, Inc. v. Commissioner*, 64 T.C. 438 (1975) (respondent's determination in sec. 1.471–6, Income Tax Regs., allowing farmers the choice of cash basis or accrual basis immunizes cash basis farmers from a subsequent challenge that the cash method does not clearly reflect income). We leave this issue for a subsequent case however, because we are asked in this case only to determine if petitioner's practical capacity approach satisfied the requirements of sec. 1.471–11(d)(4), Income Tax Regs.

[3]All references to Rules are to the Tax Court Rules of Practice and Procedure. Additionally, unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years at issue.

respondent's determination is arbitrary and a clear abuse of discretion. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532–533 (1979).

Respondent in this case, however, does not explicitly challenge the way petitioner applied its practical capacity concept to each cost center. Instead, respondent's argument presents a question of law: does the practical capacity regulation require consideration of anticipated sales in setting practical capacity levels, a factor which petitioner concedes it did not consider.

Petitioner, however, introduced detailed evidence concerning the way in which the 1975 practical capacity level was determined for each cost center. Because respondent did not challenge this evidence and because of the large amount of material involved, we here report only our conclusion that, based on our detailed review of the evidence, petitioner's 1975 practical capacity levels for each such cost center represented the best estimates based on all relevant factors, as discussed in our findings of fact, of the cost center's physical capacity to produce within a balanced, integrated production process.[4]

Therefore, if petitioner is right that its approach to practical capacity is the concept described in section 1.471–11(d)(4), Income Tax Regs., then we will find that petitioner satisfied its burden of proof in this case. However, if respondent is right

---

[4]We include, solely as an example of petitioner's methodology, the following summary description of petitioner's determination of the practical capacity level for cost center 8000, the Utah ore extraction facility. Stearns Roger Inc. built the plant in 1968–69. A September 1967, Stearns Roger report stated design criteria as follows:

| | |
|---|---|
| Ore feed | 375 tons/day |
| Lbs. Be at 0.27% ore assay | 2,025 lbs. Be/day |
| Process yield | 86% |
| Theoretical capacity | 636,000 lbs. Be/year |
| Reduction for downtime inherent in department (636,000 × 15%) | 95,000 lbs. Be/year |
| Design capacity per Stearns Roger | 540,000 lbs. Be/year |

The Utah plant met the design criteria except that the ore assay was lower (about 0.22%) than the assay used to determine the original design capacity. Accordingly, petitioner reduced its design capacity to 440,000 pounds Be/year. Plant startup was in the fourth quarter 1969 and practical capacity for 1970, the first full year of operations, was set at 264,000 pounds Be. Based upon completion of the startup and demonstration of the plant's capability by actual production of 305,605 pounds in 1971, practical capacity was increased to 305,000 pounds Be for 1972 and remained at that level beyond 1975. This practical capacity level was lower than the "design capacity" to take account of the ability of the downstream departments to absorb cost center 8000's product and to take account of cost center 6111's productive capacity which also supplied raw beryllium products to petitioner's other departments.

that the regulation's concept of practical capacity requires consideration of anticipated sales, a factor which petitioner concedes that it did not consider, then petitioner will not be entitled to idle capacity deductions in excess of the amount determined by the respondent.

With the issue in focus, we turn to examine the regulation.

We think that petitioner's practical capacity approach is consistent with, and satisfies the requirements of, the practical capacity regulation. Petitioner established practical capacity levels using theoretical capacity, "adjusted for allowances for estimated inability to achieve maximum production, such as machine breakdown, idle time, and other normal work stoppages." Sec. 1.471–11(d)(4)(ii)(c), Income Tax Regs. Petitioner's theoretical capacity determinations were based on engineering studies to determine "the level of production the manufacturer could reach if all machines and departments were operated continuously at peak efficiency." Sec. 1.471–11(d)(4)(ii)(c), Income Tax Regs. Petitioner then adjusted the theoretical capacity level downward to take account of the factors listed in the regulation's provision defining practical capacity based on theoretical capacity, the factors listed in the example following the theoretical capacity provision, and other factors to determine the maximum production level which each cost center could sustain given the practical constraints imposed by the production process itself.

Petitioner also reexamined the practical capacity levels each year, and adjusted them as necessary, "to reflect a change in underlying facts and conditions such as increased output due to automation or other changes in plant operation." Sec. 1.471–11(d)(4)(ii)(a), Income Tax Regs. Petitioner also used data derived from its experience to fine tune its practical capacity determinations to make sure that they accurately reflected the maximum production levels which each cost center could sustain given the practical constraints imposed by the production process itself. Sec. 1.471–11(d)(4)(ii)(b), Income Tax Regs.

Respondent, however, argues that the regulation requires petitioner to adjust its practical capacity levels to reflect expected productive activity resulting from anticipated sales. Respondent's theory is that petitioner in 1975 was in the middle of a severe slump. Petitioner's cost centers, especially its metal departments, had been producing significantly below

1971 levels for several years. Petitioner, when it established its 1975 practical capacity levels, did not expect to pull out of the slump in 1975. Respondent concludes that petitioner's 1975 practical capacity determinations were inaccurate because petitioner had no expectation of producing at such levels during 1975. Therefore, as he states at page 62 of his brief, respondent "contends that the regulations require occasional modification to reflect other changes in the actual operations of the plant, such as less production, fewer employees, fewer shifts, less overtime, plant shutdowns, etc., to ensure that practical capacity bears a reasonable relationship to normal plant conditions for the period."

Respondent emphasizes particular language in the regulation to support his assertion:

The determination of practical capacity and theoretical capacity *should be modified from time to time to reflect* a change in underlying facts and conditions such as increased output due to automation or *other changes in plant operation.* * * *

* * * the taxpayer *shall establish the* production operating *conditions expected during the period for which the costs are being determined,* assuming that the utilization of production facilities during operations will be approximately at capacity. This level of production activity is frequently described as practical capacity for the period and is ordinarily based upon the historical experience of the taxpayer. For example, a taxpayer operating on a 5-day, 8-hour basis may have *a "normal" production* of 100,000 units a year *based upon three years of experience.*

* * * Practical capacity may also be established by the use of "theoretical" capacity, *adjusted for allowances for estimated inability to achieve maximum production,* such as machine breakdown, *idle time, and other normal work stoppages.* * * *

Respondent's argument based on the underscored passages is that the regulation's language is broad enough to require reductions in practical capacity levels due to *all* changes in plant operations, including lower production levels due to decreased demand. Respondent took his 3-year moving average from the example based on the 3 years of experience.

Although the question is not entirely free of doubt because the regulation does not explicitly answer respondent's argument, we think, based on an analysis of the language of the practical capacity regulation as a whole, the role the practical capacity concept plays in the full absorption regulations and the theory underlying the practical capacity concept, that the

regulation does not require consideration of the demand for goods in determining practical capacity levels.

The language of the regulation as a whole indicates that petitioner did not have to consider demand in determining practical capacity. The broad language highlighted by respondent such as "other changes in plant operation" or "idle time, and other normal workstoppages," follows specific references to changes in the physical capacity to produce, such as automation. Also, the example following the definition of theoretical capacity indicates that adjustments for "idle time and other normal work stoppages," means adjustments for anticipated normal repairs, employee work breaks, startups, closedowns, holidays, and time other than a plant's ordinary shift. Nowhere in the regulation is there an explicit reference to adjusting practical capacity levels in response to changes in demand. In these circumstances, we think that the broad language cited by respondent, which is found in exemplary lists which refer only to changes in production levels arising from the production process itself, should be interpreted as referring to other and similar types of constraints internal to the production process.

Also, we think that respondent errs in concluding that the statement that practical capacity shall reflect the "conditions expected during the period for which the costs are being determined," requires that practical capacity *must* be merely an estimate of expected production. Respondent's analysis ignores the rest of the sentence from which he quotes. It states that practical capacity represents the expected production level "*assuming that* the utilization of production facilities during operations will be approximately at capacity." (Emphasis added.) This assumption that the facilities will be operated at estimated capacity clearly implies that practical capacity is the practical ability to produce, not, as respondent suggests, the estimated level of production as adjusted for anticipated sales.

We note also that the example from which respondent seeks support for his method of calculating practical capacity does not require or even authorize a 3-year moving average as a means of determining practical capacity. The example contains no averages. It merely states that, based on 3 years' experience, a taxpayer's practical capacity was 100,000 units a

year. We think that the regulation requires the type of careful analysis of all the relevant factors which petitioner performed. And, based on a reading of the regulation as a whole, instead of examining solely the clauses taken out of context by the respondent, we think that practical capacity for purposes of the regulation means what commonsense implies it means: the ability to produce, not the ability to sell. We conclude that petitioner's use of practical capacity complies with the requirements of the regulation.

We think that our conclusion is supported by the fact that the practical capacity regulation is an exception to the general rule contained in the full absorption regulations that all production costs are inventoriable costs. If respondent's interpretation were correct so that practical capacity is the expected level of production based on anticipated sales, then the immediate deduction allowed by the practical capacity regulation would serve no useful function. Under the respondent's approach, if a taxpayer's estimates of expected production were accurate, then there would be no deviation between the practical capacity level and the actual production level. A taxpayer would get a practical capacity deduction only if he overestimated future demand. We perceive no reason for respondent's approach, which could encourage some taxpayers to overestimate future demand in an attempt to generate practical capacity deductions. Such an approach, we believe, would open a possibility of abuse within the full absorption regulations which we do not think could have been intended. Accordingly, we will not interpret the regulations the way the respondent requests.[5]

Furthermore, we note that our interpretation of the practical capacity regulations is consistent with the theory underlying the practical capacity concept which has been recognized previously by other courts. In *Waukesha Motor Co. v. United States*, 322 F. Supp. 752 (E.D. Wis. 1971), affd. sub nom. *Bangor Punta Operations, Inc. v. United States*, 466 F.2d 930 (7th Cir. 1972),[6] the District Court stated:

---

[5]We take the regulation as we find it. See *Larson v. Commissioner*, 66 T.C. 159, 185–186 (1976). See also *Morrissey v. Commissioner*, 296 U.S. 344, 354–355 (1935).

[6]The *Bangor Punta* case was decided before the full absorption regulations, which included the practical capacity provision, became effective in 1973. *Bangor Punta*, therefore,

The practical capacity method of accounting involves a basic concept of business economics which is: unit production costs are substantially affected by changes in production volume. While some costs do not fluctuate with changes in production volume, others do. Therefore, because some costs are fixed, there is an inverse relationship between production volume and unit production costs. As production volume increases, unit costs of production decrease. As production volume decreases, unit costs of production increase. The lowest unit cost of production, therefore, is achieved at the maximum attainable capacity of a manufacturing operation.

Some accounting theorists believe that the differences in production costs that are attributable to differences in production volume should not be accounted for in the same manner as other production costs. This difference, they contend, represents the cost of idle (excess or unused) plant capacity that should not be carried into inventory but rather charged each year against profits. The method of accounting used to reflect this theory is called the practical capacity method. [322 F. Supp. at 757.]

This theory[7] that the practical capacity concept allocates a fixed per unit cost to goods produced and allocates the remainder of fixed indirect production costs against profit requires that practical capacity levels be set to represent the capacity to produce. Respondent's theory incorporating anticipated sales makes the practical capacity level essentially an expected production level. Under this approach, the fixed indirect production costs per unit will vary year to year depending on the expected level of production. This result is the result which the practical capacity concept was designed to

---

does not interpret the practical capacity regulation, although it describes the practical capacity concept as applied to fixed, indirect costs, during the period in which the practical capacity regulation was being drafted. See *Bangor Punta Operations, Inc. v. United States*, 466 F.2d 930 (7th Cir. 1972).

[7]Accountants sometimes use an alternate method, which is also sometimes called "practical capacity," for allocating *variable* production costs in addition to allocating fixed indirect production costs. Swan & Marcus, "Current Developments in Tax Accounting: Inventories (Now You See Them, Now You Don't)," 28 U.S.C. Tax. Inst. 493, 502 (1976). The application of a "practical capacity" concept to variable production costs for financial accounting purposes is based on a different theory than the theory discussed in the text for applying the practical capacity concept to fixed indirect production costs because variable production costs, by their nature, are fixed per unit costs. Therefore, accountants do not always require "practical capacity" levels to be determined as the physical capacity to produce (see *Waukesha Motor Co. v. United States*, 322 F. Supp. 752, 768) because the accountants' use of a "practical capacity" method for *all* production costs sometimes merges into alternative allocation methods, such as the expected production theory or the average production theory. See R. Hoffman & H. Gunders, Inventories 100–107 (1970). The practical capacity concept contained in the full absorption regulations, however, applies only to fixed indirect production costs. In this situation, the rationale articulated by the *Waukesha Motor* court of using the practical capacity method to fix unit production costs is appropriate. Also, this rationale, as discussed in the text, provides the explanation for the practical capacity exception to the full absorption regulations.

alleviate. It is only when the practical capacity level is selected as the capacity to produce, with adjustments to reflect changes to such physical capacity to produce, that fixed indirect production costs will generate fixed per unit costs. Therefore, it is petitioner's approach instead of respondent's theory which comports with the theory underlying the practical capacity concept.

We think that this practical capacity theory articulated by the court in *Waukesha Motor Co. v. United States, supra,* also explains the presence of the practical capacity provision within the full absorption regulations. Under the regulations, all costs, whether fixed or variable, which are fixed per unit costs must be absorbed by the goods. Deductions for these production costs are allowed only in the year of sale. The difference between total fixed indirect costs and the fixed per unit costs allocated to inventoriable costs is allowed as an immediate deduction against current income for idle capacity because it is viewed as a cost of not producing as opposed to a cost of production.

Petitioner's practical capacity approach, therefore, provides a coherent approach to the full absorption regulations which is consistent with prior judicial interpretation of the practical capacity concept. As we noted previously, respondent's approach denies the independent role for the practical capacity regulation which its presence in the full absorption regulation requires. Accordingly, we conclude that petitioner's approach satisfies the requirements of the practical capacity regulation. Petitioner has demonstrated that respondent's determination was arbitrary and a clear abuse of discretion. We hold that petitioner is entitled to the deductions arising from its use of the practical capacity concept in the amounts reported.

Respondent argues that petitioner's approach sets practical capacity levels assuming 24-hour a day, 7-day a week operations. Respondent argues that this approach sets practical capacity levels too high and, thus, produces an idle capacity deduction which is too large. Respondent argues that this approach clearly conflicts with the practical capacity regulation which, in its two examples, speaks of practical capacity determined on a 5-day, 8-hour basis.

Respondent's arguments do not convince us that petitioner's practical capacity approach is inconsistent with the regula-

tions. The regulations do not require that practical capacity determinations must be made on a 5-day, 8-hour basis. Instead, the focus is on a manufacturer's normal, or designed production capacity. Petitioner's normal production for some departments was on a 7-day, 24-hour basis. In some departments, this continuous operation was required by the machines. In fact, when petitioner cut back production, it still operated these departments on a continuous basis and then shut down for several days or weeks at a time. In these circumstances, petitioner does not have to determine all its practical capacity levels on a 5-day, 8-hour basis. Such an approach would produce an unreasonably low level of practical capacity because it would fail accurately to reflect the amount of idle capacity present in petitioner's production process for which it is entitled a deduction.

Also, petitioner did not arbitrarily determine its practical capacity levels for all of its cost centers on a 7-day, 24-hour basis. It used such a basis only for departments for which continuous operation was the designed norm. Practical capacity for many departments was calculated on a one or two shift basis rather than on an assumption of continuous operation. Petitioner determined the basis for each department after analysis of the demands of its integrated manufacturing system in order to keep a balance for efficient production as a whole. Thus, some bottleneck departments were designed to operate on a two or a three shift basis because downstream departments needed their output to operate efficiently. We find, therefore, that petitioner did not arbitrarily set its practical capacity levels at the highest possible levels. Instead, petitioner's practical capacity determinations were the result of the careful analysis required by the regulations.

Respondent also cites *Bangor Punta Operations, Inc. v. United States*, 466 F.2d 930 (7th Cir. 1972), as support for his contention that petitioner's practical capacity determinations were based on too high a production level basis. In *Bangor Punta*, the taxpayer's plant operated for years on a 5-day, 8-hour basis. The taxpayer's capacity on this basis was about 100 units a year. During 1 year, the taxpayer temporarily added a second shift and increased overtime hours. As a result, the taxpayer produced 180 units that year. In the following years, the taxpayer returned to its normal one shift basis but it

calculated its practical capacity based on the two shift, 180-unit year. The court held that the taxpayer misused the practical capacity concept when it relied on the extraordinary performance of 1 year in setting its practical capacity levels. Respondent argues by analogy that petitioner in this case artificially inflated its practical capacity levels by setting them at the actual production levels of the extraordinary 1971 year.

We think that respondent's argument is meritless. Petitioner did not arbitrarily pick the highest production level it ever reached. In fact, petitioner's practical capacity level often is lower than the highest experienced production level. Instead, petitioner's practical capacity levels represent the capacity level each cost center was anticipated to attain when petitioner invested its money in the 1960's to develop its balanced, integrated system.

Petitioner's position is quite unlike that of the taxpayer in *Bangor Punta* who set its practical capacity levels based on an extraordinary year which it did not expect when it designed the plant and did not plan to repeat. In this case, petitioner consciously invested money in the 1960's to increase its capacity to satisfy its contract obligations and to prepare for anticipated future business. Petitioner planned to achieve, and generally achieved across several years, the practical capacity production levels. The increased production levels in the late 1970's also indicate that petitioner's practical capacity determinations were not the artificial result of 1 year's extraordinary production. Accordingly, we hold that petitioner correctly used the practical capacity concept.

Respondent argues that petitioner's use of the practical capacity concept is abusive because, for several years, it took large deductions associated with the idle capacity arising from the mid–1970's slump. We disagree with respondent. Petitioner's application of the practical capacity concept was not tax motivated. It adopted the method during the early 1960's for business reasons associated with the allocation of fixed indirect costs in costing contracts. Petitioner consistently used the practical capacity method for financial and tax-accounting purposes since that time, which includes a substantial period before the practical capacity regulation became effective in 1973.

We further note that petitioner would have a financial incentive to understate practical capacity levels to maximize profit, particularly for financial accounting, as opposed to tax-accounting purposes. Such tension between two competing aspects of petitioner's self-interest tends, in our judgment, to support the impression of objectivity one gains from petitioner's practical capacity methodology in this case.

Finally, we do not find petitioner's use of the practical capacity concept to be abusive because the regulation entitled petitioner to take these deductions associated with idle capacity. Petitioner made a huge capital investment during the 1960's in order to produce at the levels established as practical capacity. Petitioner, in fact, generally attained these production levels for some time. But the slack in demand during the mid–1970's left petitioner with unused capacity. Petitioner is entitled to the deductions it reported which are associated with this idle capacity because it satisfied the requirements of the practical capacity regulation.

Also, we hold that petitioner made an overpayment of tax for 1972 because of adjustments which the parties concede should be made to petitioner's taxable income.

*Decision will be entered under Rule 155.*